The STATE of Ohio, Appellee,

v.

WAGES, Appellant.

[Cite as *State v. Wages* (1993), 87 Ohio App.3d 780.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 62790.

Decided July 12, 1993.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, *Albin Lipold* and *George F. Lonjak,* Assistant Prosecuting Attorneys, for appellee.

*David L. Doughten* and *Jerome Emoff,* for appellant.

PATTON, Judge.

Defendant-appellant Carl Wages appeals from his conviction of one count of aggravated murder (R.C. 2903.01) with an aggravated felony specification. For the reasons below, we affirm.

The relevant facts are as follows. The victim, Catherine De La Cruz, was discovered by her daughter Mary and the appellant beaten to death in her home. The Cuyahoga County Coroner testified that the cause of death was multiple blows to the head, causing a fractured skull and severe brain injury. The manner of death was ruled a homicide.

By way of background, Mary and the appellant were romantically involved, against the victim's strong protestations of their relationship. Mary, afflicted with cerebral palsy, lived with the victim. Their relationship became somewhat stormy after Mary met the appellant while working at a muscular dystrophy telethon. Apparently, Mary fell madly in love with the appellant and the two

soon began living together in an efficiency suite behind, but attached to, the victim's home.

Thereafter, the appellant lost his job and the two were evicted. Unable to maintain steady employment, the appellant drifted about, taking Mary with him. For a short while, Mary and the appellant lived with the victim, but the victim soon grew intolerant. The victim was afraid of the appellant and also afraid for her daughter.

The victim's fears prompted her to get a second deadbolt lock on her front door. She was the only one in possession of both keys to that particular lock. Her household rule was that, at 10:00 p.m., the second deadbolt would be activated and Mary and the appellant would not be able to gain entry. The victim went to bed at 10:00 p.m. every night.

It is apparent from the record that the appellant was being supported by Mary. Mary, a disabled person, was receiving Supplemental Social Security and also had various and sundry part-time jobs. The two were eventually kicked out of the victim's house and lived at the Holiday Inn on Lakeside Avenue for a while and also stayed with Mary's friends, Shelby Pace and Michael Jeffries. Pace and Jeffries, after a few weeks, asked Mary and the appellant to leave because of the explosive fights between the latter two.

Mary had been charging their shelter and their food on her credit cards. She also had been using her credit cards to rent a 1991 black Chrysler for the appellant to drive.

The day before the victim was discovered beaten to death, Mary and the appellant went to Raymond Edwards' apartment. Edwards, a quadriplegic, was interviewing for a live-in attendant, as his current attendant, Darrell Franklin, was seeking a job elsewhere. Mary and the appellant had been to Edwards' apartment before, but the appellant was not offered the job. Apparently, Edwards was "nervous" around the appellant.

Franklin testified that, on the evening before the victim was discovered, the appellant was using extreme profanity against the victim and stated that "he couldn't stand her" and "he hated the woman's [the victim's] guts, because she was interfering in their love life * * *."

While at Edwards' apartment, the appellant offered to go to Jeffries' apartment to pick up a video for Edwards to watch. Franklin and Mary wanted to go with the appellant, but he insisted on going by himself. He phoned Jeffries, who stayed in an apartment in downtown Cleveland, and said that he would be right over. Jeffries testified that this call took place at approximately 7:00 p.m. The appellant was coming from Edwards' apartment on Lakeshore Boulevard in the

city of Euclid, not very far from Jeffries' apartment. The round trip should have taken the appellant about one-half hour.

The appellant still had not arrived by 8:00 p.m., when Jeffries' live-in girlfriend, Pace, was on the telephone talking to the victim. Pace was a long-time friend of Mary's, so the victim sought some advice from Pace. Pace testified that the victim told her she was concerned for Mary and was fearful of the appellant. Jeffries had picked up the second phone in their apartment and had also witnessed the contents of this phone call and corroborated Pace's testimony.

This conversation was cut short at approximately 8:05–8:10 p.m. when the victim told Pace and Jeffries that she had to get off the phone because "Carl [the appellant] was pulling up into the driveway." The victim hastily hung up the phone.

Shortly thereafter, Mary, while still at Edwards' apartment, called Pace, looking for the appellant. Pace told Mary that the appellant had not yet come to get the movie.

At approximately 9:20 p.m., the appellant finally arrived at Jeffries' apartment for the movie. Both Pace and Jeffries testified he was wearing a blue sweatshirt and shorts with orange stripes on the side. The appellant said he had been detained as the result of a fire on I–90.

Franklin testified that the appellant finally arrived at Edwards' apartment, videotape in hand, some three and one-half to four hours after he departed for a trip that should have taken one-half hour. Franklin testified that the appellant had changed clothes, was very happy and appeared to be squeaky clean as if he had just taken a shower. The appellant, prior to leaving for the videotape, had been wearing a Randy Travis tee shirt, Adidas black and red jogging pants, and tennis shoes. Franklin testified that the appellant, when he returned, was wearing a blue sweatshirt and shorts and had also changed his tennis shoes.

The coroner ruled the time of death to be consistent with 8:00 p.m. to 10:00 p.m. the night before the appellant and Mary discovered her badly beaten body.

Sergeant Carl Filut of the Cleveland Police Department was called to the victim's home at approximately 8:00 a.m. The appellant had phoned 911 upon discovering the victim's body while attempting to gain access. Sgt. Filut stated that the victim's body was in full rigor mortis and the living room was splattered with dried blood. There were no signs of forced entry or ransacking and the victim's bed was not slept in.

While at the scene, Sgt. Filut asked neighbors questions about the victim and the information he was gathering made him immediately suspicious of the appellant.

Detective Richard Wilson of the Cleveland Police Department, Scientific Investigation Unit, arrived on the scene at 8:50 a.m. Det. Wilson testified that the appellant became extremely hostile and aggressive, so he "proceeded to handcuff him [the appellant] for his own protection."

During this time, Mary had relayed to the police the appellant's whereabouts the night before. Also, neighbors were very open with police regarding the stormy relationship between the appellant and the victim and the victim's intense fears of the appellant. The appellant, while at the scene, became the primary suspect. The appellant and Mary were then arrested. Mary was eventually released, but appellant was not.

The investigating officers noticed a 1991 black Chrysler in the driveway. The officers confiscated the vehicle for processing. Thereafter, an inventory search was conducted. Among the most revealing items found were a pair of red and black jogging pants and an extra pair of tennis shoes that appeared to have been laundered.

It was decided to use Luminol on the items seized from the appellant's rented vehicle. Luminol was sprayed on the jogging pants, the very pants that the appellant was wearing when he went to pick up the videotape the night of the victim's brutal murder. The pants tested positive for traces of human blood. The blood type on the jogging pants matched that of the victim's type.

The appellant was indicted and convicted for the murder of the victim. He assigns the following five errors for our review:

"I. The trial court abused its discretion in admitting testimony concerning statistical conclusions made by an incompetent witness thereby denying the appellant due process and a fair trial.

"II. The trial court erred in admitting hearsay testimony thereby denying the appellant rights guaranteed by the Fifth, Sixth and Fourteenth amendments to the United States Constitution.

"III. The trial court erred by overruling the appellant's motion to suppress evidence because probable cause for the seizure of the appellant did not exist at the time of his actual arrest.

"IV. The evidence is constitutionally insufficient to sustain the element of prior calculation and design as required by R.C. 2903.01.

"V. The trial court erred by instructing the jury that it must acquit the appellant of aggravated murder before considering the lesser included offense of murder, thereby denying the appellant his due process right to a fair trial."

## I

■ In the appellant's first assignment of error, he argues the trial court improperly admitted testimony by an incompetent DNA expert witness. Specifically, he contends that the witness was not an expert in statistics yet was allowed to reach certain statistical conclusions.

Evid.R. 702, which controls the admission of expert testimony during the course of trial, provides that:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court. In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the part of the trial court. *State v. Maupin* (1975), 42 Ohio St.2d 473, 71 O.O.2d 485, 330 N.E.2d 708; *State v. Minor* (1988), 47 Ohio App.3d 22, 546 N.E.2d 1343.

Forensic serologist Gary Clayton Harmor first testified in a voir dire examination and thereafter before the jury with respect to the scientific tests he performed on evidence in the case, his results and conclusions. Specifically, Harmor, a DNA expert, tested the appellant's blood, the victim's blood and the blood found on the appellant's jogging pants. Harmor explained to the jury that a "genetic marker" is a term used to describe a particular structure in blood that can be identified and then assigned a "type." There are four types, *viz.*, A, B, O and AB, that occur in varying degrees in the human population. Harmor gave a conclusion regarding the statistical frequency of a given genetic marker in Hispanic people, to wit, one in every five thousand Hispanic people would have the same blood type.

The appellant does not contest Harmor's expertise in forensic serology. He only disputes his expert ability in statistics. Our review of the record reveals that Harmor's statistical conclusions were based upon simple multiplication and his conclusions of frequency in Hispanic people did not require him to be qualified as an expert in statistics as well as forensic serology.

■ The record demonstrates that Harmor was sufficiently qualified to testify as an expert in the area of forensic serology. Harmor graduated from California State University in 1976 with a bachelor of science in forensic science. Thereafter, he worked collecting population frequencies for different genetic markers and has tested twelve thousand blood samples for approximately eight genetic mark-

ers. Harmor then worked on a federally funded project called "Method of Analysis" prior to working with one Brian Wraxwell, formerly of Scotland Yard. In 1978, Harmor and Wraxwell started the Serological Research Institute, where Harmor is currently working as senior forensic serologist. In the past twelve years, Harmor has trained other forensic scientists around the world and has been involved in performing his services in numerous civil and criminal cases.

Harmor being properly qualified as an expert in forensic serology, the opinions expressed by Harmor were based upon superior knowledge not possessed by the ordinary juror. Hence, the trial court did not err in allowing Harmor to testify as an expert witness.

Accordingly, the first assignment of error is overruled.

## II

In the appellant's second assignment of error, he argues the trial court erred by improperly admitting hearsay testimony. Specifically, he challenges testimony given by Jeffries and Pace, admitted pursuant to Evid.R. 803(1), and Michelle F. Kirby, Alijo Castro and Drew Woodward, admitted pursuant to Evid.R. 803(3).

## A

Evid.R. 803(1) states that:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) *Present Sense Impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."

"The principle underlying this hearsay exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of trustworthiness." *Cox v. Oliver Machinery Co.* (1987), 41 Ohio App.3d 28, 35, 534 N.E.2d 855, 863. Moreover, the spontaneity of the statement is the key to the statement's trustworthiness. *Id.* at 36, 534 N.E.2d at 863.

Jeffries and Pace testified that, while they were on the telephone with the victim, at or near the time she met her demise, she stated hastily that she had to get off the telephone because the appellant had just pulled into her driveway. The trial court allowed this testimony, after a voir dire of Jeffries, to come in under Evid.R. 803(1), present sense impression, or, in the alternative, under the catch-all provision when justice so requires. We agree.

The statement made by the victim was made as she was perceiving the appellant driving up her driveway. The requirement of the circumstantial guarantee of trustworthiness is met by the very nature of the victim's comment, despite the appellant's contention that the victim's observation needed to be independently verified.

## B

■ The trial court allowed, over objection, Michelle Kirby, a good friend of both the victim and Mary, Alijo Castro, the victim's former boyfriend, and Drew Woodward, the victim's neighbor, to testify that the victim voiced to them her fears about the appellant.

Evid.R. 803(3) reads in relevant part:

"(3) *Then Existing, Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition * * *."

In *Mut. Life Ins. Co. v. Hillmon* (1892), 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, the United States Supreme Court spoke on the then-existing state-of-mind exception to the hearsay rule:

"The rule applicable to this case has been thus stated by this court: 'Wherever the bodily or mental feeling of an individual are [*sic*] material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. * * * Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury.' "

In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, the Ohio Supreme Court cited with approval *United States v. Cohen* (C.A. 5, 1980), 631 F.2d 1223, as follows:

" * * * [T]he defendant offered the testimony of state-of-mind witnesses to demonstrate that he acted out of fear of his codefendants. In discussing Fed.Evid.R. 803(3), the court noted that the rule permitted the witnesses to relate any out-of-court statements Cohen had made to the effect that he was scared, anxious, or in any other state reflecting his then existing mental or emotional condition. However, the court also observed that the state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. Accordingly, the witnesses were allowed to offer testimony that Cohen said, 'I'm scared,' but not 'I'm scared

because Galkin threatened me.' *Cohen, supra,* at 1225." *State v. Apanovitch, supra,* 33 Ohio St.3d at 21, 514 N.E.2d at 398.

Moreover, "the testimony sought to be introduced must point towards the future rather than the past. When the state of mind is relevant it may be proved by contemporaneous declarations of feeling or intent. *Shephard v. United States* (1933), 290 U.S. 96 [54 S.Ct. 22, 78 L.Ed. 196]." *State v. Apanovitch, supra,* at 21–22, 514 N.E.2d at 398.

The statements made in this case fall within the Evid.R. 803(3) exception. The victim made the statements at a time which reflected her state of mind: that the victim was fearful and scared. See *State v. Apanovitch, supra.* Accordingly, the statements were not inadmissible hearsay and were properly admitted.

The second assignment of error is overruled.

## III

In the appellant's third assignment of error, he argues the trial court erred in overruling his motion to suppress the items seized from his rented car. Specifically, he claims that the inventory search of his vehicle was improper because the police officers lacked probable cause to arrest him. The evidence in this case belies the appellant's contentions.

A police officer is permitted to make a warrantless arrest for a felony not committed in his presence if there are reasonable grounds for making the arrest. *United States v. Watson* (1976), 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598, 605. The query then becomes whether there was probable cause for making the arrest. *Id.* "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed. *Carroll v. United States* [ (1925) ], 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543, 555]." *Beck v. Ohio* (1964), 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142, 148. In this case, the facts available to the officers at the time of the arrest would have warranted persons of reasonable caution in the belief that the appellant had committed the offense.

The record reflects that, once the officers arrived on the scene and began talking to Mary, the appellant was beginning to become aggressive. Mary broke down and started to cry, which prompted the appellant to become even more hostile. He was then handcuffed in order to subdue him so that the police could continue their investigation.

Mary spoke openly about the events the evening before the murder. The record reflects she relayed to the police the appellant's whereabouts the night before and his mysterious and unaccounted-for disappearance for several hours,

during which he was supposed to simply pick up a movie from a friend nearby. Mary also told the officers that the appellant was wearing an entirely different set of clothes when he finally arrived at Edwards' apartment after being gone for so long. Moreover, Mary told them that she spoke with the victim earlier in the day of the murder and the victim told her she was planning to go to sleep at her usual hour of 10:00 p.m. However, the victim's bed had not been slept in.

By talking to neighbors, the officers learned of the tension between the victim and the appellant. They also discovered that the victim was extremely afraid of the appellant—so afraid that she had a second lock installed on her front door. In fact, one neighbor described the appellant as a "dangerous type."

Clearly, probable cause existed for the appellant's warrantless arrest.

As the appellant's argument for suppression of items seized from an inventory search of his rented vehicle is premised upon his illegal warrantless arrest, and we find his arrest was not illegal, the motion to suppress was properly overruled.

The third assignment of error is overruled.

## IV

In the appellant's fourth assignment of error, he argues the state did not produce sufficient evidence of prior calculation and design to sustain his conviction for aggravated murder. Specifically, he contends the state did not prove beyond a reasonable doubt that the appellant planned to kill the victim. We disagree.

R.C. 2903.01(A) reads:

"No person shall purposely, and with prior calculation and design, cause the death of another."

"R.C. 2903.01(A) requires the state to prove beyond a reasonable doubt that the defendant purposely caused the death of another with 'prior calculation and design.' 'Prior calculation and design' sets up a new and more demanding standard than the old first degree murder standard of 'deliberate and premeditated malice.' 'Prior calculation and design' require some kind of studied analysis with its object being to cause the death of another. Momentary premeditation is no longer sufficient." *State v. Jenkins* (1976), 48 Ohio App.2d 99, 2 O.O.3d 73, 355 N.E.2d 825, paragraph two of the syllabus.

Further, when the evidence reveals the presence of sufficient time and opportunity for the planning of an act of homicide and the surrounding circumstances show a scheme designed to implement the calculated decision to kill, a finding of prior calculation and design by a trier of fact is justified. *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755.

When an appellate court reviews a conviction to determine whether it is supported by sufficient evidence, the court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

A review of the entire record reveals that the state indeed met its burden of proof and presented sufficient evidence to support the appellant's conviction for aggravated murder with prior calculation and design.

The appellant and the victim had a very stormy relationship. Three witnesses testified that the victim was afraid of the appellant.

Further, Michelle Hunter, a cocktail waitress at the Lakeside Holiday Inn where Mary and the appellant had lived, testified that the appellant, sometime before the murder, told her he was "super mad" at the victim because the victim had Mary's dog put to sleep. The appellant told Hunter, "I should kill her, like she did the dog, and have done with it."

Moreover, the appellant told Mary, Edwards and Franklin that he was going to Jeffries' home to get a movie. However, he went to visit the victim. One can safely assume, given their history and open contempt for one another, that it was not a social call. The appellant returned three to four hours later in a change of clothes and was squeaky clean as if he had just showered.

The evidence reveals he had planned an excuse to get away from his friends, *by himself.* Both Mary and Franklin wanted to take a ride with him, but the appellant insisted on going alone. Taken together, the state indeed proved beyond a reasonable doubt prior calculation and design.

The fourth assignment of error is overruled.

V

In the appellant's fifth assignment of error, he argues the trial court erred in giving the "acquittal first" instruction to the jury. Specifically, he contends that the instruction required the jury to reach an agreement that he was not guilty of murder before it could consider lesser included offenses.

In *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, the court held that a jury is not required to unanimously agree that a defendant is not guilty of a greater offense before addressing a lesser included offense.

In the present case, the court instructed as follows:

"If you find that the State failed to prove prior calculation and design, you must find the defendant not guilty of aggravated murder, and you will proceed with your deliberation and decide whether the State has proved beyond a reasonable doubt the elements of a lesser offense of murder."

We note that this instruction is substantially similar to the instruction considered in *State v. Thomas, supra,* which provided:

" ' * * * [I]f you find that The State has failed to prove beyond a reasonable doubt the element of prior calculation and design, then your verdict must be that the Defendant is not guilty of aggravated murder.

" 'You will then proceed with your deliberations and decide whether The State has proven beyond a reasonable doubt all of the essential elements of the lesser crime of murder.' " *Id.,* 40 Ohio St.3d at 220, 533 N.E.2d at 293.

We further note that the *Thomas* court did not find this instruction prejudicial, as it stated:

"This instruction does not expressly require unanimous acquittal on the charged crime, but rather addresses possible disagreement by the jury on the element of prior calculation and design and a corresponding inability to reach a verdict of guilty of aggravated murder. The arguments of the parties as to the prejudicial effect, if any, of such instruction are somewhat less than clear. In our opinion, this instruction has negligible coercive potential because it speaks to the jury's inability to find, whether unanimously or not, a certain element of the greater offense. We are not persuaded that the trial court's instruction unduly prejudiced the appellee, and thus we affirm his conviction of aggravated murder." *Id.*

By application of the foregoing, we likewise conclude the instruction given did not expressly require the jury to unanimously acquit the appellant of the charge of aggravated murder before it could consider the lesser included offense of murder.

Accordingly, the fifth assignment of error is overruled.

*Judgment affirmed.*

NAHRA, P.J., and KRUPANSKY, J., concur.