ABRAMS et al., Appellees,

v.

SIEGEL et al., Appellants.

[Cite as *Abrams v. Siegel,* 166 Ohio App.3d 230, 2006-Ohio-1728.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 86386 and 86659.

Decided April 6, 2006.

232

234

Walter & Haverfield, P.L.L., Michael J. Jordan, and Bonnie S. Finley, for appellee.

Reminger & Reminger Co., L.P.A., Clifford C. Masch, and Todd M. Jackett, for appellant.

KARPINSKI, Presiding Judge.

{¶ 1} Defendant, Howard S. Siegel, M.D., appeals the trial court's ruling in the suit filed against him by Marc A. Abrams, M.D., Ph.D., individually as a shareholder of Ophthalmology Associates, Inc. ("OAI") and on behalf of OAI and all other shareholders similarly situated. The rather complex facts in this case are as follows:

{¶ 2} Dr. Siegel began practicing ophthalmology at St. Vincent Charity Hospital ("Charity") in the 1960s as a shareholder in OAI. He was joined in his practice at OAI by Dr. Carl Asseff. Across the street from Charity was an office building, the Central Medical Arts building ("the medical building"), where a number of the doctors who practiced at Charity, including those in OAI, had offices. In 1985, the year that Dr. Abrams began practicing as an employee with Dr. Siegel, the medical building was owned by a group of doctors ("2475 E. 22nd Street, Inc."), who were, along with OAI, tenants in the building.

{¶ 3} At that time, Dr. Siegel was engaged in a very public dispute with Charity. Part of the dispute between Dr. Siegel and Charity concerned city-owned parking lots that each wanted to develop. See *Siegel v. St. Vincent Charity Hosp.* (1987), 35 Ohio App.3d 143, 520 N.E.2d 249.[1] In 1986, Charity also made a bid to purchase the medical building from the doctors who owned it. The purchase agreement would have honored all existing leases. OAI's 1984 lease with the medical building was due to expire in 1989. Because Dr. Siegel believed that Charity would refuse to renew this lease when it expired, Drs. Asseff and Siegel entered into a new lease ("the 1986 lease"), which would last until 1996. This 1986 lease provided OAI with an entire floor of the medical building and included free renovation of the space for OAI. Two members of the 2475 E. 22nd Street, Inc. board of directors ratified the lease.

{¶ 4} The remainder of the board of directors and trustees, however, objected to the lease and revoked it. In 1987, Drs. Siegel and Asseff outbid Charity for the medical building and formed a corporation that became the owner of the building ("CMA"). One of the disputes in the case at bar is which lease, the 1984 or the 1986 lease, was in effect during the time Drs. Siegel and Asseff owned the building and OAI was a tenant.

{¶ 5} In 1989, after working for OAI as an employee for several years, Dr. Abrams, one of the plaintiffs in this suit, became an equal partner with Drs. Siegel and Asseff in OAI. In 1994, Dr. Siegel approached Dr. Abrams to sign a new lease for the office. Dr. Siegel told Dr. Abrams that the former lease had expired in 1989 and that OAI had been a month-to-month tenant since then. Dr. Abrams had no knowledge of the 1986 lease, so he agreed to sign the 1994 lease, which charged a significantly higher rent than the 1986 lease.

{¶ 6} In late 1997, at the annual meeting of OAI, of which only the three doctors were shareholders, Dr. Asseff announced that he was leaving the practice and that there was nothing to discuss. Dr. Asseff removed all his files and

---

1.  See, also, *Siegel v. D'Eramo* (1992) 80 Ohio App.3d 72, 608 N.E.2d 842. In both cases, Dr. Siegel disputed Charity's refusal to renew his privileges to practice at the hospital. D'Eramo was the CEO of Charity at the time Dr. Siegel lost his privileges.

belongings from the office; only Drs. Siegel and Abrams remained in the practice at the beginning of 1998.

{¶ 7} In March 1998, Dr. Siegel presented his partners, Drs. Asseff and Abrams, with a letter announcing his impending retirement. The contract each doctor had with OAI stated that upon reaching the age of 65, any shareholder could, with a one-year notice, retire and redeem his shares in the corporation. They tried to find a third ophthalmologist to join the practice, but apparently cut back on this search as the relationship between Dr. Siegel and Dr. Abrams deteriorated.

{¶ 8} Dr. Siegel continued to collect his full-time salary, although he admitted at trial that he informed his insurance company he had cut back his practice to part-time. Dr. Abrams tried, numerous times, to negotiate a change in Dr. Siegel's salary to reflect his reduced hours, but Dr. Siegel refused to discuss the question.

{¶ 9} In July 2000, while OAI was still short-staffed, Dr. Siegel announced that he was going on a cruise in late winter of 2001. Dr. Abrams suggested that the timing of this vacation was poor in light of the short-handed situation in the practice. Dr. Siegel remained unpersuaded and did not change his plans. At some point after Dr. Asseff left the practice, Dr. Siegel announced that he would no longer operate on patients; thus all the surgery work was left to Dr. Abrams.

{¶ 10} On January 27, 2001, Dr. Siegel sent the following letter to OAI's statutory agent:

> Please advise Ophthalmology Associates that the current, contentious, stressful situation at OAI has so adversely affected my mental state that I am no longer able to properly render medical care to my patients.
>
> Therefore, effective immediately, I will be on medical leave of absence until further notice. I will attempt to attend to patients the week of January 29, but all future appointments to see me should be canceled.
>
> Please direct all inquiries to Mr. Michael Shore.

Dr. Siegel then began his medical leave/vacation. He returned to the practice in April 2001.

{¶ 11} Meanwhile, after Dr. Siegel left for his medical leave/vacation, Dr. Abrams filed, on behalf of himself and on behalf of OAI, a complaint against Dr. Siegel for corporate dissolution, receivership, injunction, damages, and declaratory judgment. He also filed a derivative action on behalf of OAI. In March 2001, Dr. Siegel filed his answer, along with a counterclaim against Dr. Abrams and a cross-claim against OAI. Shortly thereafter, the medical building, with Dr. Siegel as sole shareholder of the corporation owning the building, sued OAI. The court consolidated the two suits. In May 2001, Drs. Siegel and Abrams entered

into an agreement for the dissolution of OAI. OAI was officially dissolved in early June 2001.

{¶ 12} The litigation over the corporation continued and proceeded to a bench trial in which the court found that Dr. Siegel's testimony "contained inconsistencies and lacked credibility." The court issued multiple rulings, which Dr. Siegel appealed, raising eight assignments of error, the first of which states:

    I.   The trial court erred to the prejudice of the appellant [sic] in interpreting Dr. Siegel's employment contract with OAI.

{¶ 13} Dr. Siegel argues that the trial court erred in its interpretation of his employment contract with OAI when it held that Dr. Siegel was in breach of his contract because "Dr. Siegel did not provide OAI with an approximate equal number of scheduled office hours toward the practice and related services to OAI." The trial court further held that Dr. Siegel's failure to provide OAI with sufficient office hours resulted in his unjust enrichment and a breach of his fiduciary duty to OAI.

{¶ 14} The trial court found that the evidence demonstrated that, for the years of 1996 through 2000, Dr. Abrams generated a profit of approximately $821,000 for OAI, and Dr. Siegel caused a loss to OAI of approximately $597,000. Rather than dispute these figures, Dr. Siegel argues that they are inconsequential because the employment contract assures him of an income equal to the other physicians.

{¶ 15} "The construction of a written contract is a matter of law, reviewed de novo. *Saunders v. Mortensen,* 101 Ohio St.3d 86, 88, 2004-Ohio-24, 801 N.E.2d 452, at ¶ 9. The goal of construction of a contract is to find the intent of the parties. The presumption is that the parties' intent may be ascertained in the language used in the written instrument. Id." *Winters v. Hart* (2005), 162 Ohio App.3d 15, 2005-Ohio-3367, 832 N.E.2d 753, ¶ 9. In ascertaining the intent of the parties, the entire document is given weight. "The plain rule of construction requires that every provision of a contract shall be given effect if possible." *Farmers' Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 337, 94 N.E. 834. As the Ohio Supreme Court noted: "We have long held that a contract is to be read as a whole and the intent of each part gathered from a consideration of the whole. * * * If it is reasonable to do so, we must give effect to each provision of the contract." *Saunders v. Mortensen* (2004), 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 16.

{¶ 16} Dr. Siegel relies on Section 3(A) of the employment contract, which states:

    A fixed annual salary of One Hundred Fifty–Six Thousand Dollars ($156,000) * * * shall be payable in equal bi-weekly installments throughout the term of

this Agreement, subject however, to provisions of SECTIONS 9 and 10 of this Agreement.

Dr. Siegel argues that the fixed salary is in no way tied to the number of hours he works as an employee of OAI. Section 3 states that its enforcement is subject to Section 9, which says that partially disabled employees who have exhausted their sick leave "shall receive compensation computed as follows: The fees actually billed by Employer for services rendered by Employee shall be reduced by eight percent (8%) to cover possible bad debts, and then the disabled Employee shall receive as his compensation sixty percent (60%) of the said reduced fees."

{¶ 17} Section 9 further discusses "partially disabled" employee:

While the determination as to a partial disability shall be within the discretion of the Board of Directors of Employee, it **shall automatically be presumed** that Executive Physician–Employee is partially disabled if he has not generated, by services which he has rendered to Employer in any consecutive twelve (12) month period **gross fees which are at least equal to seventy-five percent (75%) of the average gross fees generated by all** other Executive Physician–Employees of Employer. In the event that the said Executive Physician–Employee has not generated the aforementioned gross fees and services, then he shall be considered to be partially disabled as of the beginning of the twelve (12) month period involved and **any payments made to him under the provisions of SECTION 3 hereinabove [sic] shall be recalculated and amounts overpaid shall be repaid to the employer.**

Dr. Siegel's claim that payment of an employee's salary was in no way tied to the employee's production of income from treating patients contradicts the restrictions set out in Section 9, which reduces the employee's compensation for failure to generate income comparable to the other employees.

{¶ 18} Dr. Abrams is correct in pointing out that Dr. Siegel violated the contract when he failed to satisfy Section 5, which states:

Section 5—Employee shall devote his major effort to the business of Employer. Employee, along with all other Executive Physician–Employees shall be required to provide Employer with an approximate equal number of scheduled office hours for the conduct of the practice of Ophthalmology and related services to Employer.

{¶ 19} Because evidence of the disparity between the income generated by two doctors is disputed, it is possible that Dr. Siegel became subject to a finding of partial disability around 1996 when he significantly curtailed his practice of holding office hours. The record does not contain sufficient evidence, however, to determine whether this clause of the contract would have been in effect.

{¶ 20} Neither party cited Section 9 in his argument. Rather, Dr. Siegel counters that, if Dr. Abrams was unhappy with the amount of work Dr. Siegel was doing, he should have renegotiated Dr. Siegel's salary, as provided for in Section 12 of the contract. That section states:

> Section 12—RELATION TO OTHER EXECUTIVE PHYSICIAN–EM-PLOYEES: Employee recognizes that Employer presently has employed other Executive Physician–Employees who are contributing to Employer's activities in approximately the same amount as Employee. In the event that such contribution to Employer's activities, or work week of any Executive Physician–Employee shall change materially, the Employee's compensation may be renegotiated.

{¶ 21} This argument is disingenuous, however, because Dr. Abrams testified, and Dr. Siegel did not contradict, that Dr. Abrams had repeatedly attempted to renegotiate Dr. Siegel's salary in light of his reduced hours, but Dr. Siegel refused to discuss the issue.

{¶ 22} Further, although neither the parties nor the trial court discusses it, Section 10 of the contract states:

> In the event that Employee shall, during the term hereof, become totally disabled to the extent that he shall not be able to engage in the practice of medicine, and to attend to patients, then immediately upon fixing the commencement time of such total disability * * * this Employment Agreement shall terminate.

Upon OAI's receipt of Dr. Siegel's letter stating that he was "no longer able to properly render medical care" to his patients, this clause became effective, and Dr. Siegel ceased to be an employee of OAI. Again, however, we note neither side sought to enforce this clause of the contract.[2]

{¶ 23} Because Section 3 of the contract providing for compensation clearly makes compensation subject to Section 9, the argument that compensation is not tied to productivity within the contract lacks merit. The trial court did not err in finding that Dr. Siegel had violated the contract when he failed to work an approximately equal amount of office hours as Dr. Abrams. Accordingly, this assignment of error is overruled.

{¶ 24} For his second assignment of error, Dr. Siegel states:

II. The trial court erred to the prejudice of the appellant in finding that 1986 lease valid.

---

2. Nonetheless, as mentioned above, this court reviews the contract de novo. The contract is clear in stating that Dr. Siegel's claim of total disability terminated his employment agreement with OAI.

{¶ 25} Dr. Siegel complains that the trial court erred when it ruled that the 1986 lease was the lease in effect when Dr. Siegel convinced Dr. Abrams to sign the 1994 lease. Dr. Siegel relies on documentation showing that the board of directors of the corporation that owned the building at the time the 1986 contract was made had later declared it void. He argues, therefore, that the 1984 lease, which had expired in 1989, had been the valid lease until its expiration and that OAI remained on a month-to-month lease after the 1984 lease expired.

{¶ 26} The trial court, however, ruled that "the 1986 lease was subsequently ratified and adopted by Dr. Siegel and Dr. Asseff[,] who acquired control of the building in 1986 or 1987." This finding is corroborated by the letter Dr. Siegel wrote to Mr. Traeger, Dr. Abrams's expert, in which he admitted that he and Dr. Asseff "decided to leave the lease intact since it did not matter about the terms of the lease since Dr. Siegel and Dr. Asseff each owned 50% of both Central Medical Arts and Ophthalmology Associates." The rental rate per square foot under both leases was $15. The 1984 lease, however, limited the tenancy to "Room 305." The 1986 lease, on the other hand, covered "all of floor number 3 (7569 sq. ft.)." The evidence showed that OAI occupied the full 7569 square feet at the time the corporation was dissolved. We must conclude, therefore, that the 1986 lease was in effect until May 31, 1996. Dr. Siegel informed Mr. Traeger, Dr. Abrams's expert witness, that the rent was $18.50 per square foot under the 1994 lease, and Mr. Traeger used that amount in calculating the rent from the time the 1986 lease would have expired until 2000. These are the calculations upon which the trial court relied in its decision.

{¶ 27} In the same letter to Mr. Traeger, Dr. Siegel explained the reason for adopting the 1994 lease: "Dr. Asseff * * * reviewed the OAI lease and realized that since Dr. Abrams was not an investor in Central Medical Arts that he was enjoying the benefit of an old sweetheart lease with it's [sic] below market rate of $15.00 a square foot." [3]

{¶ 28} After Dr. Abrams began paying one-third of the rent, at $18.50 per square foot, under the 1994 lease, the amount Drs. Siegel and Asseff paid toward the rent is not clear. Although Dr. Siegel submitted copies of the corporation's tax returns for 1992, 1993, and 1994, none of these documents is credible evidence. Dr. Siegel himself admitted in testimony that discrepancies exist between the amount stated for rent on the corporate income tax return and the amount Dr. Siegel's accountant calculated as rent on some of the tax returns.

---

3. Although they realized that Dr. Abrams "clearly enjoyed a below market rental for at least four years," they decided "it was inappropriate" to ask him to pay the difference between his portion of the rent paid and what his portion of the rent would have been at the market rate. Dr. Siegel did point out in the letter, however, that Dr. Abrams "personally benefited in the amount of $91,274.00."

Further, OAI's former bookkeeper testified that, on Dr. Siegel's orders, she kept three separate sets of books for rent payments. She also testified that Dr. Siegel shredded the W–2 form the accountants had prepared and altered the tax return when Dr. Siegel's accountants refused to allow him to categorize a lump-sum payment to him for unpaid wages as a repayment of a loan. The tax return filed that year differed in several respects from the return the accountants had prepared.[4]

{¶ 29} In his letter to Mr. Traeger, however, Dr. Siegel admitted that he and Dr. Asseff adopted the terms of the 1986 lease until 1994, when they realized that Dr. Abrams was benefitting from its terms. We find, therefore, that the trial court did not err in ruling that Drs. Siegel and Asseff ratified and adopted the 1986 lease. Accordingly, this assignment of error is overruled.

{¶ 30} For his third assignment of error, Dr. Siegel states:

III. The trial court erred to the prejudice of the appellant in admitting the appellee's expert's testimony.

{¶ 31} Dr. Abrams presented Kenneth Traeger as an expert witness. The expert is an attorney whose practice includes working with medical groups. He testified that he was experienced in dealing with tax and financial issues of medical practices and other professional groups. The expert prepared two reports for Dr. Abrams for use in the lawsuit. The first report computed the amount of rent OAI overpaid as a result of OAI entering into the 1994 lease while the 1986 lease was still valid. The second report computed the amount of money Dr. Abrams generated as compared to the amount Dr. Siegel generated, along with the difference in proportion to their equal compensation.

{¶ 32} When counsel asked the court to allow this witness to testify as an expert, Dr. Siegel's counsel objected, saying, "I don't know what he is opining on. I don't know what he said so far." The trial court overruled this objection when it said, "I'll say he's an expert." Dr. Siegel's counsel never claimed, moreover, that he did not receive copies of Mr. Traeger's expert reports.

{¶ 33} The admission of expert testimony is governed by Evid.R. 702, which states:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

---

4. The bookkeeper also testified that Dr. Siegel altered insurance documents to remove his name as the owner of the policy and inserted OAI as the owner.

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 34} An expert "witness may be qualified as an expert based on special knowledge, skill, experience, training or education. Evid.R. 702." *McConnell v. Budget Inns of Am.* (1998), 129 Ohio App.3d 615, 625, 718 N.E.2d 948. "The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court. In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the part of the trial court." *State v. Wages* (1993), 87 Ohio App.3d 780, 786, 623 N.E.2d 193, citing *State v. Maupin* (1975), 42 Ohio St.2d 473, 71 O.O.2d 485, 330 N.E.2d 708; *State v. Minor* (1988), 47 Ohio App.3d 22, 546 N.E.2d 1343. In order for the trial court's ruling to be found an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 35} The expert, to be qualified, must fulfill the first prong of the test; that is, he must be in a position to clarify a set of facts for the factfinder. "With regard to the first of these factors, the expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror. The qualification of an expert depends upon the expert's possession of special knowledge that he or she has acquired either by study of recognized authorities on the subject or *by practical experience* that he or she can impart to the jury which will assist the jury in understanding a pertinent matter." (Emphasis added and citations omitted). *Azzano v. O'Malley–Clements* (1998), 126 Ohio App.3d 368, 373, 710 N.E.2d 373. From the record and the questions by the court, which in this case was the sole factfinder, it is clear that the expert witness's testimony was important in the court's understanding of the case. Through expertise gained in his practice dealing with the taxes and financial

matters of medical and other professional groups, the expert was able to clarify the confusing and often conflicting amounts assigned for rental payments, income generated, and salaries paid. The witness fulfilled the first prong of the test.

{¶ 36} The second factor in the test for an expert witness is that his qualification "as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony" does not require advanced education; rather it requires that the witness's experience allows him to assist the trier of fact in understanding the facts of the case. Further, "the expert witness is not required to be the best witness on the subject, but his or her testimony must assist the trier of fact in the search for the truth." *Azzano* at 374, 710 N.E.2d 373. Here, the expert witness previously had worked with medical groups and other types of professional groups. His understanding of the nature of the practice, its method of bookkeeping, and its billing was valuable to the court for an understanding of the way a medical practice earns income and manages its affairs. His analysis and graphs of the rental data and books of the corporation assisted the court. We conclude the expert qualified under this prong of the test also.

{¶ 37} The third requirement in the test for an expert witness is that the source of information the expert uses and his method of reaching a conclusion must be reliable. In the case at bar, the expert witness used information that Dr. Siegel himself provided. He arrived at his conclusions by basic arithmetic, a time-tested formula. We find no error in the trial court's decision to qualify him as an expert.

{¶ 38} It is telling that Dr. Siegel fails to point to any errors in the testimony of the expert witness. He also does not point out any prejudice to his case resulting from the testimony. The objections that Dr. Siegel's counsel raised during this testimony related mostly to discussion of the employment contracts of the parties and to Dr. Siegel's compensation without providing equal work. Dr. Siegel's counsel challenged not the witness's expertise in interpreting the contract but rather his actual interpretation. Counsel's next objection during the testimony concerned the expert's involvement in drafting Dr. Abrams's lease for his office after OAI dissolved. Another objection also concerned Dr. Abrams's post-OAI lease. This time, Dr. Siegel's counsel objected that the subject matter of the questioning was "so far afield."

{¶ 39} The final set of objections to the expert's testimony occurred on redirect when the expert witness was asked to opine on the rescission of the 1986 lease by the corporate board that previously owned the building. Dr. Siegel's counsel objected, saying: "This is not part of this man's report. There is nothing that we have been given, any notice, of this witness." The court acknowledged that the

question did not address the area in which the expert had been qualified as a witness, but stated that it wanted to hear whether the expert witness had evidence that Dr. Siegel and Asseff had ratified the 1986 contract. Counsel for both sides offered to brief this issue. The expert witness went on to discuss an exhibit, the December 11, 2000 letter from Dr. Siegel to the witness concerning the 1986 lease. The witness answered the question by saying that Dr. Siegel admitted in the letter that they had decided to leave the lease intact because Drs. Siegel and Asseff owned the building during the time frame in question, and it was inconsequential which lease was in effect. He agreed with counsel's clarification of his statement that as the sole owners of the building "they could have done what they wanted with respect to the lease."

{¶ 40} Even if we did not find that the expert was properly qualified, the admission of his testimony would be harmless error because defendant has failed to show prejudice as required by Civ.R. 61:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

{¶ 41} The trial court, therefore, did not err in admitting the testimony of the expert witness. Accordingly, this assignment of error is overruled.

{¶ 42} For his fourth assignment of error, Dr. Siegel states:

IV. The trial court erred to the prejudice of the appellant in admitting Exhibits 13 and 14.

{¶ 43} Dr. Siegel argues that the court erred in admitting the expert's reports because his testimony was not admissible. Because his contention concerning the admissibility of the expert's testimony is without merit, his objection to the admission of the expert's reports is also without merit. Accordingly, this assignment of error is overruled.

{¶ 44} For his fifth assignment of error, Dr. Siegel states:

V. The verdict in favor of the appellee and against the appellant was against the manifest weight of the evidence.

{¶ 45} Dr. Siegel claims that the manifest weight of the evidence favors judgment for him on all the issues at bar.

{¶ 46} An appellate court will not reverse a judgment as being against the manifest weight of the evidence when that verdict is supported by some credible, competent evidence that goes to all the essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' " 'thirteenth juror' " ' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, at 42, 102 S.Ct. 2211, 72 L.Ed.2d 652. In a challenge to the manifest weight of the evidence, a court reviews the record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflict in the evidence, the jury clearly lost its way." *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 47} This court has "delineated the following factors as *guidelines* or *considerations* " for a reviewing court "to take into account when weighing the evidence":

1.  a reviewing court is not required to accept as true the incredible;
2.  whether evidence was uncontradicted;
3.  whether a witness was impeached;
4.  what was not proved;
5.  the certainty of the evidence;
6.  the reliability of the evidence;
7.  whether a witness's testimony was self-serving;
8.  whether the evidence was vague, uncertain, conflicting, or fragmentary. (Emphasis sic.) *State v. Mattison* (1985), 23 Ohio App.3d 10, 14, 23 OBR 43, 490 N.E.2d 926, citing *State v. Gaston* (Jan. 11, 1979), Cuyahoga App. No. 37846, 1979 WL 209795.

{¶ 48} As to the issue of the validity of the 1986 lease at the time the 1994 lease was signed, Dr. Siegel argues that the manifest weight of the evidence demonstrated that the 1986 lease was never valid because the board of directors of the corporation that owned the building at the time the lease was executed had revoked it. The lease was, he claims, void ab initio.

{¶ 49} This argument ignores, however, the letter Dr. Siegel sent to Mr. Traeger in which he admitted that he and Dr. Asseff, once they were sole owners of the building, had agreed to enforce the 1986 lease. The only evidence before the court supporting Dr. Siegel's claim that the lease never took effect once he and Dr. Asseff owned the building is Dr. Siegel's own self-serving testimony.

The trial court explicitly found in its findings that "Dr. Siegel's testimony contained inconsistencies and lacked credibility."

{¶ 50} We therefore find that the trial court's ruling concerning the lease dispute is correct.

{¶ 51} Dr. Siegel next claims that the court's finding of fraud against him was not supported by competent and credible evidence.

A claim of common-law fraud requires proof of the following elements: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, quoting *Burr v. Bd. of Cty. Commrs. of Stark Cty.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101.

{¶ 52} In his appellate brief, Dr. Siegel does not claim that he told Dr. Abrams about the existence of the 1986 lease. Rather, he argues that because he believed the lease to be void ab initio, there was nothing to disclose about the 1986 lease when he persuaded Dr. Abrams to sign the 1994 lease. He argues, therefore, that Dr. Abrams has failed to prove the first prong required to show fraud: concealment of a fact.

{¶ 53} As we noted above, however, the letter Dr. Siegel sent to Mr. Traeger belies the claim that Dr. Siegel thought the 1986 lease was void. He admitted in the letter, in fact, that the 1986 lease had been in effect until the execution of the 1994 lease.

{¶ 54} The second prong of the test, that the omitted information is material to the transaction at hand, is not disputed. The third prong, knowledge of the falseness of the statement that no prior lease existed in 1994, again was proven by the December 11, 2000 letter Dr. Siegel sent to Mr. Traeger. The fourth prong, justifiable reliance on the false statement, is also not disputed. The proximate injury resulting from the fraud was shown in the calculations Mr. Traeger provided in court.

{¶ 55} We conclude that the manifest weight of the evidence supports the trial court's finding that Dr. Siegel fraudulently induced Dr. Abrams into entering into the 1994 lease.

{¶ 56} Dr. Siegel also claims that the trial court's holding that he had breached the employment contract was against the manifest weight of the

evidence. His only support for this argument, however, is Dr. Abrams's failure to invoke the clause of the contract permitting him to renegotiate the contract with Dr. Siegel. This line of reasoning is disingenuous in light of Dr. Abrams's testimony that Dr. Siegel refused to negotiate the terms.

{¶ 57} Further, Dr. Siegel's limited argument ignores sections 9 and 10 of the contract. Viewing the contract as a whole, we find that the manifest weight of the evidence supports the trial court's ruling that Dr. Siegel breached the employment contract.

{¶ 58} Finally, Dr. Siegel claims that the manifest weight of the evidence does not support the trial court's holding that he breached his fiduciary duty to OAI. To support his argument, he points only to his previous claims concerning the contract and the lease disputes. Not only do those arguments fail, as previously noted, but they ignore the statement of the bookkeeper that Dr. Siegel ordered her to keep three separate sets of books. They ignore Dr. Siegel's fraudulent alteration of the income tax forms the accountants had produced and his reduction of his personal income by over $100,000 on the corporate tax return. His arguments also ignore his alteration of an insurance policy to reflect OAI as the owner instead of himself and the submission of this falsified policy to OAI's accountants.

{¶ 59} The manifest weight of the evidence strongly supports the trial court's finding that Dr. Siegel breached his fiduciary duty to OAI. Accordingly, this assignment of error is overruled.

{¶ 60} For his sixth assignment of error, Dr. Siegel states:
VI. The appellee failed to proffer sufficient evidence to establish damages to a reasonable degree of certainty.

{¶ 61} Dr. Siegel's only argument under this assignment of error is that Mr. Traeger's testimony and reports were inadmissible. The only objection he makes to the actual amounts calculated is that "Traeger did not review 'any documents that showed direct payment of rent' to CMA from OAI." Dr. Siegel fails to specify, however, which of the three sets of books concerning OAI's payment of rent to CMA Mr. Traeger should have reviewed.

{¶ 62} Mr. Traeger reviewed the 1986 and 1994 leases and used the amounts stated in them to calculate how much rent OAI would have paid between 1994 and 1996 under the terms of the 1986 lease. That lease undisputedly expired May 31, 1996. He then calculated the amount OAI allegedly paid for that two-year period under the 1994 lease. The difference between the 1994 lease payment and the amount the 1986 lease payment would have been for those two years was the figure Mr. Traeger determined was the overpayment of rent. Dr. Siegel fails to point to any flaw in the methodology or actual calculation Mr.

Traeger used. Furthermore, Dr. Siegel did not present any expert testimony to support his case.

{¶ 63} The trial court had credible evidence before it to support the amount of damages awarded, and Dr. Siegel presented no evidence to support a different amount. Accordingly, this assignment of error is overruled.

{¶ 64} For his seventh assignment of error, Dr. Siegel states:

VII. The trial court erred to the prejudice of the appellant in denying his motion for a new trial.

{¶ 65} In this assignment of error, Dr. Siegel relies on his claims in the previous assignments of error to support his argument that the trial court should have granted his motion for a new trial. Because none of his previous arguments has merit, however, he failed to sustain his burden of proof as to this argument. This assignment of error, therefore, is overruled.

{¶ 66} For his eighth assignment of error, Dr. Siegel states:

VIII. The trial court erred in awarding attorney fees to the appellee.

{¶ 67} We review an award of attorney fees under an abuse-of-discretion standard. *Apicella v. PAF Corp.* (1984), 17 Ohio App.3d 245, 249, 17 OBR 512, 479 N.E.2d 315. Dr. Siegel argues that the trial court erred in awarding attorney fees to Dr. Abrams in the derivative action he filed on behalf of OAI, because Dr. Abrams's motion for attorney fees was not filed until after the court entered its judgment. He fails to note, however, that Dr. Abrams requested attorney fees in his complaint. " 'It is well established that when attorney fees are requested in the complaint, there is no final appealable order until those fees have been addressed by the trial court unless the court utilizes Civ.R. 54(B) language.' " *Warne v. Bamfield* (2005), 161 Ohio App.3d 537, 831 N.E.2d 451, ¶ 14, quoting *Ft. Frye Teachers Assn. v. Ft. Frye Local School Dist. Bd. of Edn.* (1993), 87 Ohio App.3d 840, 843, 623 N.E.2d 232. Dr. Abrams's motion for attorney fees was not, therefore, untimely.

{¶ 68} Alternatively, Dr. Siegel argues that the judgment is not capable of division between what was awarded to Dr. Abrams individually and what was awarded to OAI. The trial court had set a hearing, however, for that issue to be determined.

{¶ 69} Finally, Dr. Siegel argues that attorney fees are available only upon a derivative shareholder action that benefits the corporation.

"In legal effect, a stockholders' suit is one by the corporation conducted by the stockholder as its representative. The stockholder is only a nominal plaintiff, the corporation being the real party in interest.

"The suit is a derivative one, and is to be distinguished from a representative action brought by a stockholder as an individual and for his own benefit in behalf of himself and other stockholders similarly situated. Where plaintiff does not seek to enforce relief for the benefit of the corporation, it is not derivative and not a stockholders' suit."

*Ramey v. Cincinnati Enquirer, Inc.* (1974), 508 F.2d 1188, 1199, quoting 13 W. Fletcher, Private Corporations (Perm. Ed. 1970, Section 5939). Dr. Siegel correctly notes that Dr. Abrams brought the suit both as a derivative action and as an individual shareholder. The trial court ruled, however, that "[p]laintiffs may be awarded their attorney fees *as to their shareholders' derivative claim only,* in an amount to be determined at a subsequent hearing." Accordingly, this argument lacks merit.

{¶ 70} Dr. Siegel also argues that because the corporation was dissolved, it cannot have benefitted from the derivative action. The trial court ruled to the contrary: "The corporation Ophthalmology Associates, Inc. received a benefit from the expenditure of attorney fees in the derivative action brought by the plaintiff." In *Ramey,* supra, the derivative suit concerned a takeover of the corporation. Even though the corporation was absorbed by another corporation before the end of the litigation, the court ruled that the corporation had benefitted from the intervention. The court held: "We conclude that the services performed by plaintiffs' attorneys justify an award of fees, even though no fund has been brought into court and even though it may be impossible to assign an exact monetary value to the benefit conferred upon the corporation." Id. at 1194.

{¶ 71} Similarly, here, the evidence showed that Dr. Siegel was draining the corporation of funds in violation of his employment agreement. He was also filing false income tax returns for the corporation and keeping three different sets of books on the corporation's business. Dr. Abrams's derivative suit benefited the corporation, if only by preventing it from being further drained by Dr. Siegel's actions.

{¶ 72} Finally, Dr. Siegel argues that the attorney fees cannot come out of the corporation, but rather must come from a "common fund" resulting from the litigation. Case law does not support this argument. "A corporation does not have to maintain a special fund for attorney fees for fees to be awarded. * * * In order to recover attorney fees, however, the party who brought suit must be successful." *Russell v. United Missionary Baptist Church* (1994), 92 Ohio App.3d 736, 739, 637 N.E.2d 82, citing *Ramey v. Cincinnati Enquirer* (C.A.6, 1974), 508 F.2d 1188, 1194, 1195.

{¶ 73} OAI's lack of a common fund does not extinguish Dr. Abrams's right to be compensated for the attorney fees incurred in pursuing the derivative suit.

The trial court did not err in its award of attorney fees. Accordingly, this assignment of error is overruled.

Judgment affirmed.

CALABRESE and KILBANE, JJ., concur.