GEVEDON, Appellee,

v.

IVEY et al., Appellants.

[Cite as *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007-Ohio-2970.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21609.

Decided June 15, 2007.

Stephen M. Pfarrer, for appellee.

William O. Cass Jr., for appellant.

FAIN, Judge.

{¶ 1} Defendants-appellants, Glenn Ivey and Rose Sharpe, appeal from a trial court judgment holding that a transfer of property from Ivey to Sharpe is fraudulent. The trial court concluded that although Ivey and Sharpe had shown that the transfer was made for a reasonably equivalent value, this demonstration did not negate the badges of fraud established by plaintiff-appellee, Kenneth Gevedon. The trial court, therefore, found the transfer fraudulent under the totality of the circumstances because Gevedon had established five of 11 recognized badges of fraud.

{¶ 2} Ivey and Sharpe contend that the trial court abused its discretion in finding that a fraudulent transfer had occurred. According to them, the trial court failed to recognize that the presumption of fraud had been rebutted and therefore erred in concluding that Ivey and Sharpe had the burden of proof. Ivey and Sharpe also contend that the trial court improperly elevated badges of fraud that it had previously deemed unworthy of significant weight, for the purpose of finding clear and convincing evidence of a fraudulent transfer.

{¶ 3} We conclude that the trial court's decision was supported by a rational view of the evidence. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 4} This controversy arises from a lawsuit and transfer of land that occurred in early 1999. The plaintiff, Kenneth Gevedon, and one of the defendants, Glenn Ivey, had been involved in various business dealings together since around 1993, when they started a used car business. Gevedon and Ivey also bought real estate together, which they renovated and sold at a profit.

{¶ 5} Based on Gevedon's testimony and the documents admitted at trial, it appears that Ivey borrowed the following amounts from Gevedon: $45,000 in

June and September 1997 to purchase a property on Stapleton Court; $15,000 more in March 1998; and $20,000 in April 1998 to purchase real estate located at 2511 Brunswick. In December 1998, Gevedon filed suit against Ivey in Dayton Municipal Court, claiming that Ivey owed him $88,700. This amount consisted of about $67,000 in unpaid principal and $21,700 in interest.

{¶ 6} In the meantime, Ivey had also been involved in a real estate transaction with his aunt, Rose Sharpe. This circumstance was not unusual, as Ivey and Sharpe had been mutually involved in several real estate deals between 1992 and 1998. In September 1998, Ivey approached Sharpe about purchasing a trailer park located at 2001 Valley Street in Dayton, Ohio. Sharpe asked a friend, Jack Schmermund, to inspect the park to see whether the property was worth being purchased. When Schmermund agreed that the property should be purchased, Sharpe gave Ivey $8,000 towards the purchase price of $78,000. Schmermund also loaned Ivey $39,000. The property was deeded to Ivey on September 28, 1998, and the deed was recorded on October 13, 1998. Ivey executed a mortgage note in the amount of $39,000 to Schmermund on September 22, 1998, and the mortgage note was recorded on October 13, 1998, as well.

{¶ 7} The payments on the original mortgage note were $815 per month. When the property was purchased, there were five tenants, and the lot rents were sufficient to pay the mortgage. Ivey collected the rents and gave them to Sharpe, who wrote a check to Schmermund. This was done because Sharpe had promised Schmermund from the beginning of the deal that she would pay for the loan if Ivey failed to make the payments on the trailer park. This promise was not in writing and was not recorded.

{¶ 8} As we indicated, Ivey was sued in December 1998, and was served with notice of Gevedon's pending lawsuit on January 12, 1999. On January 27, 1999, Schmermund loaned Ivey another $39,000, and Ivey signed a second mortgage for that amount, payable to Schmermund. This mortgage was recorded on January 28, 1999. At that time, the mortgage notes on the property equaled the property's fair market value of $78,000. In other words, Ivey did not appear to have any equity in the property after the transaction, although he appears to have possessed at least $31,000 in equity before the second mortgage was filed.[1]

{¶ 9} Sharpe signed an agreement on January 29, 1999, indicating that if Ivey could not make the March 1, 1999 payment on the property, Sharpe would pay the mortgage balance of $74,000. Subsequently, Sharpe became aware that Ivey was not able to make the March 1, 1999 payment due to a "nervous breakdown."

---

1. This figure is based on the amounts then owed to Schmermund and to Sharpe. No evidence was presented at trial indicating that the fair market value of the trailer park was anything other than $78,000.

As a result, Sharpe signed a mortgage note to Schmermund in the amount of $74,000, on February 26, 1999. On the same day, Ivey signed a deed, transferring the property to Sharpe. The deed was filed on February 26, 1999. Because of the additional loan that had been made, the payment to Schmermund increased to $1,289.44. The first payment in this amount was made by Sharpe on March 1, 1999, and she continued to make payments thereafter. In February and March 1999, five units were being rented at the trailer park at $195 each per month, and a house was being rented for $250 per month. The total of these amounts was approximately $1,225.

{¶ 10} After being served in the December 1998 municipal court action, Ivey failed to file an answer. Consequently, Gevedon filed a motion for default judgment on February 25, 1999. An entry granting the motion was filed the same day. No evidence was presented at trial indicating that Ivey, Sharpe, or Schmermund knew about the motion for default judgment or entry granting the motion when they signed the deed and mortgage. In fact, the default judgment papers were not even mailed to Ivey until February 26, 1999.

{¶ 11} The paperwork in this case is a bit unorthodox. For example, conveyance fees were not paid on some transactions between Ivey and Sharpe in 1992, 1993, 1998, and 1999. In fact, a "statement of reason for exemption from real property conveyance fee" filed with the recorder in connection with the February 26, 1999 transfer incorrectly states that no conveyance fee was required because the property was transferred to "evidence a gift, in any form, between husband and wife, or parent and child or the spouse of either."

{¶ 12} Gevedon filed a certificate of judgment against the trailer park property on February 26, 1999, just a few hours after the property had been transferred to Sharpe. At that time, the original mortgages from Ivey to Schmermund were already of record. Subsequently, on March 3, 1999, Schmermund filed a satisfaction of mortgage with the recorder, releasing the $39,000 January 28, 1999 mortgage. On the same day, Schmermund filed Sharpe's $74,000 mortgage with the recorder. And finally, on March 5, 1999, Schmermund filed a satisfaction of mortgage releasing the $39,000 mortgage that had previously been filed against Ivey in October 1998.

{¶ 13} Gevedon attempted to attach the lot rents from the trailer park by executing on the judgment in Dayton Municipal Court, but the attached payments were ordered released to Sharpe. In October 1999, Ivey filed a bankruptcy petition and included the debt to Gevedon. However, the bankruptcy court later ordered that the debt could not be discharged. Gevedon then filed the present action, contending that the conveyance of the trailer park property to Sharpe was fraudulent.

{¶ 14} After a trial to the bench, a magistrate found in October 2001 that the conveyance was fraudulent. The trial court adopted the magistrate's decision, and an appeal followed. In the appeal, we reversed the judgment of the trial court and remanded the matter pursuant to App.R. 12(C). In particular, we noted:

{¶ 15} "We agree with the trial court that several of the badges of fraud set forth in R.C. 1336.04(B) had clearly been established. We also agree that Ivey had retained some degree of possession and control over the property by continuing to live there, but that this control appeared to be minimal and entitled to little weight. We disagree, however, with the factor on which the trial court placed the greatest emphasis: whether the transfer to Sharpe was for reasonably equivalent value.

{¶ 16} "* * *

{¶ 17} "In our view, there is no question that Sharpe assumed debt in exchange for receiving the title to 2001 Valley Street from Ivey, and this assumption of debt amounted to consideration over and above the forgiveness of Sharpe's $8,000 personal loan to Ivey. Although the manner in which the auditor's forms were completed may suggest an improper attempt to avoid transfer fees, it does not conclusively establish a failure of consideration. If assumption of $74,000 in debt is factored into the transfer, Ivey did receive a reasonably equivalent value in the transaction. Thus, the trial court erred in relying 'most heavily' on the fact that no consideration was given.

{¶ 18} "Although the trial court erred in finding a lack of consideration, it properly concluded that other badges of fraud had been established by the evidence. Thus, pursuant to App.R. 12(C), we will remand this matter to the trial court for it to reconsider whether the evidence established a fraudulent convey-ance pursuant to R.C. 1336.04, keeping in mind that there was consideration for the transfer." *Gevedon v. Ivey,* Montgomery App. No. 19893, 2003-Ohio-6521, 2003 WL 22880791, at ¶ 15 and 19–20.

{¶ 19} On remand, the trial court did not conduct a further hearing.

{¶ 20} The court then issued a decision in April, 2006, stating that while the defendant had "demonstrated that the transfer was made for a reasonably equivalent value, that does not negate the badges of fraud established by Plaintiff. If a mere showing of good faith or reasonably equivalent value was enough to negate the other badges of fraud, such would render them meaning-less. The established badges of fraud must be taken into consideration in the totality of the circumstances. Therefore, since Plaintiff demonstrated five of the eleven badges of fraud, this Court finds that, considering the totality of the circumstances, the transfer of the property from Ivey to Sharpe was fraudulent."

{¶ 21} Based on the above reasoning, the trial court held that Gevedon could pursue any collection proceeding available under R.C. 1336.07, including attachment, execution, injunction, or receivership. The court also found that punitive damages were not warranted because there was no evidence to support a finding that Ivey had acted with reckless disregard of the consequences of legal rights of others when he transferred the property to Sharpe. From this adverse judgment, Ivey and Sharpe appeal.

## II

{¶ 22} Ivey and Sharpe's single assignment of error is as follows:

{¶ 23} "The trial court committed an abuse of discretion in finding a fraudulent transfer occurred under R.C. 1336.04."

{¶ 24} Before we address this assignment of error, a few procedural comments are in order. The single assignment of error is couched in terms of abuse of discretion, but what Ivey and Sharpe are contesting is the evidentiary basis for the trial court's decision. To the extent that this can be considered a "manifest weight" challenge, we are precluded from considering it because we have already reversed the trial court decision once on manifest-weight grounds. *Gevedon*, 2003-Ohio-6521, 2003 WL 22880791, at ¶ 20. In this paragraph of our prior opinion, we specifically remanded the case pursuant to App.R. 12(C), which states:

{¶ 25} "In any civil action or proceeding which was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and do not find any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and do not find that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings; *provided further that a judgment shall be reversed only once on the manifest weight of the evidence.*" (Emphasis added.)

{¶ 26} Under the express limitation in the emphasized final clause of App.R. 12(C), we are precluded from considering a manifest-weight challenge. Normally, we would go on to consider whether the evidence is legally sufficient to support the trial court's verdict. In the past, the Ohio Supreme Court has distinguished between the concepts of "manifest weight" and "legal sufficiency," stating that they are "both quantitatively and qualitatively different." *State v.*

*Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph two of the syllabus. In *Thompkins*, the court described sufficiency as " 'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." Id. at 386, 678 N.E.2d 541.

{¶ 27} In contrast, even if the trial court judgment is sustained by sufficient evidence, an appellate court may do the following:

{¶ 28} "[It] may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect *in inducing belief.*' (Emphasis added.) Black's [Law Dictionary (6th Ed.1990)] 1594.

{¶ 29} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony. * * * ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction')." (Citations omitted.) *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 30} After *Thompkins* was decided, lower courts struggled with its potential application to civil cases. For example, in *Reed v. Key–Chrysler Plymouth* (1998), 125 Ohio App.3d 437, 440, 708 N.E.2d 1021, we commented on the difficulty of reconciling *Thompkins* with the standard of review in *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, which had stated, "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." The First District Court of Appeals expressed the same concern in *Lakeshore Properties, Universal*

*AM–CAM, Ltd. v. Sharonville* (Feb. 16, 2001), Hamilton App. No. C–000321, 2001 WL 127650, *4.

{¶ 31} In *Reed*, we also noted:

{¶ 32} "The standard of review from *C.E. Morris*, however, is indistinguishable from the standard of appellate review for sufficiency of the evidence. * * * Following that standard, an appellate court could not, in a civil case, find a sufficiency of the evidence and still conclude that the judgment is against the manifest weight of the evidence, as *Thompkins* allows in criminal cases. Nevertheless, the statutory and constitutional authorities that recognize appellate jurisdiction to review matters of weight of evidence do not support drawing a distinction between civil and criminal cases. See Section 3(B)(3), Article IV, Constitution; App.R. 12(C); App. R. 9(B); R.C. 2321.01; R.C. 2321.18; R.C. 2945.831.

{¶ 33} "Furthermore, the *C.E. Morris* standard is a rule of such deference that it erases any distinction between review for weight of the evidence in the courts of appeals and review by the Supreme Court of matters of law. See *Ross v. Ross* (1980), 64 Ohio St.2d 203, 204 [18 O.O.3d 414], 414 N.E.2d 426, 427–428 (finding that the Supreme Court 'does not undertake to weigh the evidence and pass upon its sufficiency but will ascertain from the record whether there is *some competent evidence* to sustain the findings of the trial court.' [Emphasis added.] ). This rule of deference does not appear to us to be compatible with the constitutionally recognized jurisdiction of this court to review matters involving the weight of evidence.

{¶ 34} "Nor does it appear consistent with the active role that the Supreme Court recognized for courts of appeal in the *Thompkins* decision." (Citations omitted.) *Reed*, 125 Ohio App.3d at 440–441, 708 N.E.2d 1021.

{¶ 35} We stressed in *Reed* that a standard analogous to civil cases would resolve these logical inconsistencies. We also said we would await further guidance from the Ohio Supreme Court on how the distinction between "manifest weight" and "legal sufficiency" should apply in civil matters. Id.

{¶ 36} The requested guidance was not forthcoming, even after three dissenting justices urged the Ohio Supreme in 2003 to render an opinion clarifying the standard. See *In re Estate of Worstell*, 100 Ohio St.3d 1258, 2003-Ohio-6387, 799 N.E.2d 636, at ¶ 3 (Pfeifer, J., dissenting from dismissal of appeal as having been improvidently allowed). In his dissent, Justice Pfeifer stated:

{¶ 37} "The court of appeals relied on *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, where this court explained when it is appropriate to overturn a jury verdict to prevent a manifest miscarriage of justice in a criminal trial. This reliance was misplaced because the standard of proof in a criminal

trial is higher than in a civil trial. We should render an opinion in this case that clarifies the standard. I dissent and would reverse the judgment of the court of appeals." *Worstell,* 100 Ohio St.3d 1258, 2003-Ohio-6387, 799 N.E.2d 636, ¶ 3.

{¶ 38} The majority of the Ohio Supreme Court did not agree to clarify the standard of review, a circumstance that left appellate courts with the impression that a majority may have disagreed with Justice Pfeifer's comment that reliance on *Thompkins* was misplaced. Due to the lack of guidance, a number of appellate districts, including our own, eventually applied the *Thompkins* standard in civil cases. See, e.g., *Scelza v. Mikhael,* Summit App. No. 22994, 2007-Ohio-2199, 2007 WL 1345827, at ¶ 5 (Ninth District notes long-standing trend of applying *Thompkins* in both civil and criminal cases). See, also, *Hook v. Brinker,* Montgomery App. No. 21389, 2006-Ohio-5583, 2006 WL 3030815, at ¶ 13; *Melcher v. Ryan,* Belmont App. No. 05 BE 40, 2006-Ohio-4609, 2006 WL 2573267, at ¶ 40; and *Kramer v. Kramer,* Seneca App. No. 13–02–03, 2002-Ohio-4383, 2002 WL 1967104, at ¶ 10 (civil cases from the Second, Seventh, and Third Districts that rely on *Thompkins* rather than *C.E. Morris* ).

{¶ 39} Other districts have taken a different approach, by citing both *Thompkins* and *C.E. Morris* in civil cases without discussing any logical inconsistencies. See, e.g., *Ensman v. Ohio Dept. of Rehab. & Corr.*, Franklin App. No. 06AP–592, 2006-Ohio-6788, 2006 WL 3743070, at ¶ 4; *State Farm Mut. Auto. Ins. Co. v. Travelers Property Cas.*, Muskingham App. No. CT 2002–0065, 2002-Ohio-3687, 2002 WL 1610517, at ¶ 23; and *Abrams v. Siegel,* 166 Ohio App.3d 230, 247, 2006-Ohio-1728, 850 N.E.2d 99, at ¶ 46 (civil cases from the Tenth, Fifth, and Eighth District Courts of Appeals using both standards).

{¶ 40} In contrast, the Sixth and Twelfth District Courts of Appeals have rejected the application of *Thompkins* to civil cases. See *Squires v. Luckey Farmers, Inc.*, Ottawa App. No. OT–03–046, 2004-Ohio-4919, 2004 WL 2072453, and *State v. Griggs,* Butler App. No. CA–2001–08–194, 2002-Ohio-4375, 2002 WL 1964664, at ¶ 5. In *Squires,* a panel of the Sixth District reasoned:

{¶ 41} "The Ohio Supreme Court set forth the appellate standard to be applied when a civil judgment is challenged on the basis of manifest weight of the evidence in *C.E. Morris v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279 [8 O.O.3d 261], 376 N.E.2d 578. Under this standard, we must examine the record to see whether the trial court's judgment is supported by 'some competent, credible evidence going to all the essential elements of the case.' Further, in civil cases involving the issue of manifest weight, an appellate court cannot weigh the evidence and pass upon its sufficiency. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80 [10 OBR 408], 461 N.E.2d 1273. This manifest weight standard has always been different from that employed in a criminal case. See, e.g., *State v. Eley* (1978), 56 Ohio St.2d 169 [10 O.O.3d 340], 383 N.E.2d 132,

syllabus (In a criminal case, a reviewing court cannot overturn the decision of the trier of fact where the evidence, if believed, would be sufficient to convince the average mind of the defendant's guilt beyond a reasonable doubt). Moreover, in *Thompkins*, the Ohio Supreme Court did not extend the standard for determining whether a criminal conviction is against the manifest weight evidence to civil cases. Thus, we are bound by the rule set forth in *C.E. Morris*. Accord, *Lichtenberg Constr. & Dev., Inc. v. Paul W. Wilson, Inc.* (Sept. 28, 2001), 1st Dist. No. C–000811 [2001 WL 1141236]." *Squires*, 2004-Ohio-4919, 2004 WL 2072453, at ¶ 31.

{¶ 42} The confusion and disagreement among Ohio courts, and even among different panels in the same district, have been widespread. For example, *Squires* contradicts a decision the Sixth District issued about one month earlier, in which a panel of the court specifically stated that the manifest-weight standard in *Thompkins* would be applied to civil cases. See *Heck v. Whitehurst Co.*, Lucas App. No. L–03–1134, 2004-Ohio-4366, 2004 WL 1857131, at ¶ 25. Likewise, the Eighth District stated in 2002 that the criminal sufficiency standard in *Thompkins* did not apply to civil proceedings. *State v. Tillery* (Apr. 4, 2002), Cuyahoga App. No. 79116, 2002 WL 509555, *5, citing *Siegal v. Magic Carpet & Upholstery* (Aug. 12, 1999), Cuyahoga App. No. 74645, 1999 WL 608808. Yet, in 2006, the Eighth District indicated in *Abrams* (a civil case) that it was sitting as the "thirteenth juror." See *Abrams v. Siegel*, 166 Ohio App.3d 230, 2006-Ohio-1728, 850 N.E.2d 99, at ¶ 46.

{¶ 43} In 2005, the Third District Court of Appeals acknowledged the difference between the "civil" standard in *C.E. Morris* and the "criminal" standard in *Thompkins*. See *State v. Fulk*, Van Wert App. No. 15–04–17, 2005-Ohio-2506, 2005 WL 1205253, at ¶ 24. The Third District made this comment in the context of a sex-offender-classification proceeding, which had generally been classified as a civil matter. Despite acknowledging the difference, the Third District applied the *Thompkins* standard. The Third District noted in a subsequent sex-offender proceeding that it had consistently applied the more stringent criminal standard from *Thompkins*. See *State v. Large*, Hancock App. No. 5–05–37, 2006-Ohio-2664, 2006 WL 1459764, at ¶ 13.

{¶ 44} The Eighth District has also extended the more searching criminal standard to certain civil matters like juvenile-custody determinations. See *In re N.B.*, Cuyahoga App. No. 81392, 2003-Ohio-3656, 2003 WL 21545142. In this regard, the Eighth District reasoned:

{¶ 45} "When evaluating whether a judgment is against the manifest weight of the evidence in a civil action, the court uses virtually the same standard of review as in the criminal context. *In re Washington* (2001), 143 Ohio App.3d 576, 758 N.E.2d 724. In *In re M.M.* (Feb. 7, 2002), Cuyahoga App. No. 79947 [2002 WL

207610] this court explained that standard as applied to a custody case: 'In civil cases, we review a manifest weight challenge to determine whether some competent, credible evidence supports the judgment. The criminal standard, while stated in more detail and arguably requiring a more searching review, also focuses on the credibility of evidence, allowing a judge or reviewing court to consider not only the sufficiency of evidence, but the quality of evidence introduced. While a juvenile custody proceeding is not a criminal matter, it is consistently recognized as implicating important rights deserving of more scrutiny than the ordinary civil proceeding. Therefore, to the extent the civil manifest-weight review is less demanding than that in criminal matters, in juvenile proceedings such review should more closely approximate the criminal standard. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279 [8 O.O.3d 261], 376 N.E.2d 578, syllabus; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541; *State v. Martin* (1983), 20 Ohio App.3d 172, 175 [20 OBR 215], 485 N.E.2d 717.'

{¶ 46} "Additionally, the Supreme Court in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, stated: Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *In re N.B.*, 2003-Ohio-3656, 2003 WL 21545142, at ¶ 22–23.

{¶ 47} In *Davis v. DiNunzio*, Lake App. No. 2004–L–106, 2005-Ohio-2883, 2005 WL 1383975, the Eleventh District Court of Appeals presented yet another viewpoint. In *Davis*, the appellants challenged the sufficiency and weight of the evidence supporting a stalking civil protection order that had been granted. Id. at ¶ 22. The Eleventh District first acknowledged an abundance of authority holding that "general distinctions pervading weight and sufficiency disappear in the context of civil proceedings." Id. Among these authorities were cases from the Eleventh, Sixth, and First Districts. However, the Eleventh District decided to reconsider its position on the issue and ultimately held that weight and sufficiency must be treated independently in both civil and criminal contexts. The reasoning for this change in approach was described as follows:

{¶ 48} "While the degree of proof necessary in a civil proceeding is significantly less than that required in a criminal matter, there is no cogent reason why the fundamental logical differences relating to evidential sufficiency and weight cease to exist in a civil context. For example, a plaintiff in a tort or breach of contract action must offer sufficient evidence to establish the elements of his claim by a

preponderance of the evidence. A challenge to the evidential sufficiency asks a reviewing court to examine whether the plaintiff met his burden of proof. An analysis of this sort is mechanical in that it requires a court to observe the record and determine whether the plaintiff offered adequate evidence to support the elements of his particular claim.

{¶ 49} "Alternatively, evidential weight involves an analysis of whether the plaintiff met his burden of persuasion. This analysis is more abstract and requires a court to look at the evidence in its totality and engage in a limited weighing exercise for purposes of assessing its credibility. Hence, a plaintiff may present sufficient evidence to meet the elements of his tort or breach claim, yet the greater weight of the credible evidence may still militate against a verdict in his favor.

{¶ 50} "As the distinction between burden of proof and burden of persuasion remains regardless of the character of the proceedings, we hold that the terms weight and sufficiency must be treated independently in both criminal and civil contexts. Our previous holdings conflating these terms are therefore overruled." *Davis* at ¶ 23–25.

{¶ 51} In *Davis,* the Eleventh District also disagreed with the analysis of *C.E. Morris* that had been expressed in *Reed, Lakeshore Properties,* and *Siegal* (the Second, First, and Eighth appellate districts, respectively).

{¶ 52} Specifically, the Eleventh District stated that these appellate districts had interpreted the *C.E. Morris* standard "to mirror the standard of review for sufficiency of the evidence set forth in *Thompkins.* See, e.g. *Lakeshore Properties,* supra, at [*4] 12, citing *Reed v. Key–Chrysler Plymouth* (1998), 125 Ohio App.3d 437, 440, 708 N.E.2d 1021; *Siegal v. Magic Carpet & Upholstery* (Aug. 12, 1999), 8th Dist. No. 74645 [1999 WL 608808], 1999 Ohio App. LEXIS 3733. In our view, such an interpretation is invalid. To the extent that the *C.E. Morris Co.* standard requires an analysis of evidential credibility it presupposes a weighing exercise. It is therefore analytically different from a sufficiency analysis. To wit, *Thompkins* states 'sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.' * * * see, also, *State v. Schlee* [(Dec. 23, 1994), 11th Dist. No. 93–L–082, 1994 WL 738452] supra, (holding 'The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.' Id. at 13). A court analyzing the sufficiency of the evidence does not engage in a weighing of evidential credibility and therefore the concepts of weight and sufficiency are analytically separate regardless of whether the court is reviewing a criminal or a civil matter." *Davis,* 2005-Ohio-2883, 2005 WL 1383975, at ¶ 22, fn. 1.

{¶ 53} After the present case was submitted, the Ohio Supreme Court issued a decision that attempted to resolve some of the confusion. In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court accepted a discretionary appeal to decide whether the Eighth District Court of Appeals had applied the proper standard of review in a sexual-offender-classification case. At the beginning of its discussion in *Wilson*, the Ohio Supreme Court indicated that separate manifest-weight standards exist for civil and criminal cases. 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 23. The court then outlined the standards for both "civil" and "criminal" review. Regarding the "civil standard," the court said:

{¶ 54} "[T]he civil manifest-weight-of-the-evidence standard was explained in *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus ('Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence'). We have also recognized when reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80–81, 10 OBR 408, 461 N.E.2d 1273. This presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' * * * 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 24.

{¶ 55} After making these comments, the Ohio Supreme Court outlined the "criminal" manifest-weight standard, which was taken directly from *Thompkins*, and distinguished it from the "civil" manifest-weight standard. In particular, the court stressed:

{¶ 56} "Both *C.E. Morris Co.* * * * and *Thompkins* instruct that the fact-finder should be afforded great deference. However, the standard in *C.E. Morris Co.* tends to merge the concepts of weight and sufficiency. * * * Thus, a judgment supported by 'some competent, credible evidence going to all the essential elements of the case' must be affirmed. * * * Conversely, under *Thompkins*, even though there may be sufficient evidence to support a conviction, a reviewing court can still reweigh the evidence and reverse a lower court's holdings. * * * Thus, the civil-manifest-weight-of-the-evidence standard affords

the lower court more deference then does the criminal standard." 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 26,

{¶ 57} Without offering any analysis—and apparently undisturbed by the merging of "the concepts of weight and sufficiency"—the Ohio Supreme Court held that sex-offender-classification proceedings are civil in nature and should therefore be reviewed under the more deferential "civil" standard. Id. at ¶ 32.

{¶ 58} The Ohio Supreme Court's discussion in *Wilson* illustrates the existing state of confusion among Ohio appellate courts. The court began by noting that eight appellate districts had adopted the "civil" standard in sex-offender cases, and four had adopted the "criminal" standard. Id. at ¶ 27. The court then observed that the Eighth District Court of Appeals had failed to specify in the underlying decision whether it was applying the civil or criminal standard. Notably, this occurred even though similar cases in the Eighth District had previously used the "civil" manifest-weight-of-the-evidence standard. Id. at ¶ 33. The Ohio Supreme Court then held:

{¶ 59} "It is clear that the court of appeals applied the criminal manifest-weight-of-the-evidence standard, because it did not evaluate or discuss the trial judge's rationale or any of the evidence the judge cited in support of his decision finding that the state failed to prove its case. Under the civil standard, examining the evidence underlying the trial judge's decision is a prerequisite to determining whether the trial court's judgment is supported by some competent, credible evidence. Without this analysis, it is apparent that the court of appeals reweighed the evidence and substituted its judgment for that of the trial judge. Thus, the court of appeals improperly applied the criminal-law standard set forth in *Thompkins*. Mere disagreement with the trial court's findings is not sufficient to overturn them. Accordingly, we hold that the court of appeals erred by not applying the civil manifest-weight-of-the-evidence standard in reviewing the trial court's determination that Wilson is not a sexual predator." Id. at ¶ 40.

{¶ 60} Based on the comments in *Wilson*, we conclude that the issues of "sufficiency of the evidence" and "manifest weight" have been essentially merged in civil cases, leaving appellate courts with the option of conducting a "civil" manifest-weight analysis, in which the court reviews the trial court's rationale and the evidence the trial court has cited in support of its decision. If competent, credible evidence exists to support the trial court's decision, it must be affirmed.

{¶ 61} Unfortunately, the Ohio Supreme Court failed to address or even consider the Sixth District's view of the "distinction between burden of proof and burden of persuasion" that "remains regardless of the character of the proceedings." *Davis*, 2005-Ohio-2883, 2005 WL 1383975, at ¶ 25. The Ohio Supreme Court also failed to address the comment we made nearly nine years ago about

the lack of support in statutory and constitutional authorities for drawing distinctions between civil and criminal cases on matters of weight of the evidence. *Reed,* 125 Ohio App.3d at 440, 708 N.E.2d 1021. And finally, the Ohio Supreme Court failed to address our observation in *Reed* that "the *C.E. Morris* standard is a rule of such deference that it erases any distinction between review for weight of the evidence in the courts of appeals and review by the Supreme Court of matters of law." Id. at 440, 708 N.E.2d 1021.

{¶ 62} In view of the preceding discussion, there is no need to make a separate determination whether the evidence in the present case was legally sufficient. However, if we were to consider the matter, we would find sufficient evidence to support the trial court's decision. In such situations, we have previously held that reversal on the grounds of sufficiency "requires that the conclusion of the trial court cannot be supported by any rational view of the evidence; not just that it is suspicious." *Stone Excavating, Inc. v. Newmark Homes, Inc.,* Montgomery App. No. 20307, 2004-Ohio-4119, 2004 WL 1753377, at ¶ 24.

{¶ 63} After examining the evidence, we hold that the trial court's conclusion can be supported by a rational view of the evidence. Our prior opinion noted that Ivey did receive a "reasonably equivalent value" in the transaction if Sharpe's assumption of $74,000 in debt were factored into the transfer. *Gevedon,* 2003-Ohio-6521, 2003 WL 22880791, at ¶ 19. This acknowledgement had the effect of rebutting the presumption of fraud and placing the final burden of proof on Gevedon, as the party attempting to set aside the conveyance. *Blood v. Nofzinger,* 162 Ohio App.3d 545, 559, 2005-Ohio-3859, 834 N.E.2d 358, at ¶ 50. Accordingly, we remanded the case to the trial court so that the court could consider "whether the evidence established a fraudulent conveyance pursuant to R.C. 1336.04, keeping in mind that there was consideration for the transfer." *Gevedon,* 2003-Ohio-6521, 2003 WL 22880791, at ¶ 20.

{¶ 64} On remand, the trial court found fraud established under the totality of the circumstances, which included five of the 11 "badges of fraud." This finding is supported by a rational view of the evidence. Under R.C. 1336.04(B)(2), the "badges of fraud" include, but are not limited to the following factors:

{¶ 65} "(1) Whether the transfer or obligation was to an insider;

{¶ 66} "(2) Whether the debtor retained possession or control of the property transferred after the transfer;

{¶ 67} "(3) Whether the transfer or obligation was disclosed or concealed;

{¶ 68} "(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

{¶ 69} "(5) Whether the transfer was of substantially all of the assets of the debtor;

{¶ 70} "(6) Whether the debtor absconded;

{¶ 71} "(7) Whether the debtor removed or concealed assets;

{¶ 72} "(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

{¶ 73} "(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

{¶ 74} "(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

{¶ 75} "(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor."

{¶ 76} Notably, the plaintiff does not have to show evidence of all the badges of fraud. *Crocker v. Hood* (1996), 113 Ohio App.3d 478, 483, 681 N.E.2d 460. " 'Badges of fraud' are circumstances so frequently attending fraudulent transfers that the inference of fraud arises from them." *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio* (1987), 37 Ohio App.3d 162, 166, 524 N.E.2d 915.

{¶ 77} The transfer in the present case was to an insider—Ivey's aunt—and was not disclosed to Gevedon, even though Ivey was aware of the pending lawsuit. More important, the evidence indicates that Ivey was served with the lawsuit, which demanded payment of $88,700, on January 12, 1999. At the time, there was only one mortgage on the trailer park—a $39,000 mortgage that Schmermund recorded in October 1998. Assuming for the sake of argument that Ivey owed Sharpe $8,000 on the loan Sharpe claims to have made, Ivey would still have had at least $31,000 in equity, and probably more, in the property when he became aware of the pending lawsuit. We reach this conclusion because the property was purchased for $78,000 in September 1998, and Ivey signed a second mortgage to Schmermund in the amount of $39,000 on January 27, 1999, even though he was aware of the pending lawsuit. This large sum of cash is not reflected in the bankruptcy petition that was filed later the same year. In fact, the only "cash on hand" listed in the petition is the sum of $20. Ivey was also admittedly insolvent at the time the second $39,000 mortgage was recorded. He was no more solvent a month later, when the trailer park was transferred to Sharpe.

{¶ 78} As an additional matter, finding that the transfer was required to occur when it did would require the willing suspension of disbelief. In this regard, Ivey

said that he did not think he was preferring certain creditors over others when he transferred the property on February 26, 1999, because he had no equity in the property at that time. However, the reason Ivey had no equity is that he had accepted an additional $39,000 loan from Schmermund on January 27, 1999. Furthermore, Sharpe testified that the trailer park had generated enough income in January, February, and March 1999, to cover the original mortgage payment and nearly all of the second mortgage. Specifically, Sharpe testified that in February and March 1999, five units were being rented at $195 each per month, and a house was also being rented for $250 per month, for a total of $1,225 in income per month. The payment before March, 1999, was $815 per month, and went up in March 1999 to $1289.44 per month to account for the additional $39,000 loan. Therefore, when the property was transferred, the mortgage payments were being made with the rental income, and there would have been no urgent reason to transfer the property at that time.

{¶ 79} In light of the above facts, a rational basis exists for the finding that fraud was established under a totality of the circumstances. Although Ivey may have transferred the property for a reasonably equivalent value, the trial court had a rational basis for deciding that Gevedon had satisfied the final burden of proving that the property was fraudulently transferred.

{¶ 80} Based on the preceding discussion, Ivey and Sharpe's single assignment of error is overruled.

### III

{¶ 81} Ivey and Sharpe's single assignment of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

WOLFF, P.J., and DONOVAN, J., concur.