NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0884n.06
Filed: December 27, 2007

No. 07-3251

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STEEL SERVICE CORPORATION, )
)
    Plaintiff-Appellant, ) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
    v. ) SOUTHERN DISTRICT OF OHIO
)
BOARD OF COUNTY )
COMMISSIONERS OF HAMILTON ) OPINION
COUNTY, OHIO, )
)
    Defendant-Appellee. )
)

**Before: GUY, MOORE, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** In December of 2000, the Board of County

Commissioners of Hamilton County, Ohio (the County) awarded Steel Service Corp., a Mississippi

corporation, the general contract (the Contract) for the erection of the steel superstructure for the

Cincinnati Reds Great American Ball Park (the Ball Park). By October of 2001, the County had

directed Steel Service to accelerate its work to make up for delays that had occurred on the project.

Steel Service did so, and in December of 2001 submitted a claim to the County for its additional

costs, including extra costs incurred by its subcontractors. A month later, the County and Steel

Service executed Change Order #1, with neither party accepting responsibility for the delays, but

agreeing that the County would make a provisional payment to Steel Service that would apply

toward the latter's additional costs for the accelerated work. In 2004, Steel Service filed suit against

-1-

the County for breach of contract, alleging that the County had not paid Steel Service's additional costs, which then totaled approximately $5 million.

The County moved for summary judgment, arguing that Steel Service's claim was settled by Change Order #9, executed in August of 2003, and that a portion of Steel Service's claim was a "pass-through" claim on behalf of its subcontractors that is not cognizable under Ohio law. The district court granted summary judgment for the County on these grounds. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On December 20, 2000, the County and Steel Service entered into the Contract, whereby Steel Service agreed to act as the general contractor in the fabrication and erection of the steel superstructure for the Ball Park. The initial contract sum was approximately $33 million. Several documents comprise the Contract, including a Standard Form of Agreement and the General and Supplementary Conditions, both of which were executed on American Institute of Architects (AIA) forms that were modified for the Ball Park project. Evidence in the record indicates that the County drafted the Contract, which was awarded through a public bidding process.

Work on the project commenced on or about December 21, 2000. Based on the initial construction schedule, Steel Service claims that it was to begin erection of the steel superstructure in April of 2001 and complete the project by December of that same year. Delays ensued, however, and actual construction did not begin until July of 2001. Neither party has accepted responsibility for the delays.

In October of 2001, Hunt Construction Group, Inc., the Construction Manager for the County, directed Steel Service in writing to undertake "Extraordinary Measures, including the provision of additional manpower, shifts, overtime and equipment" in order to complete its work in accordance with the Contract and the project construction schedule. The record indicates that Hunt had issued the same directive in both May and September of 2001. Whether the May directive was made orally or in writing is unclear; the September directive was indisputably oral.

Paragraph 8.2.7 of the Contract defines Extraordinary Measures as "work[ing] additional shifts or overtime, supply[ing] additional manpower, equipment and facilities, and . . . other similar measures." The same paragraph requires Steel Service to take such measures, at the County's expense, if the County deems them necessary. But paragraph 8.2.8 obligates Steel Service to take Extraordinary Measures at its own expense if the delays result from any fault, neglect, omission, or act of Steel Service. Steel Service alleges that the Extraordinary Measures it was directed to take were necessary to make up for time lost as a result of the County's inattention to the project, incomplete and inadequate structural-steel designs provided by the County, and the County's constant revisions to the designs—all of which, it claims, disrupted and hindered its performance. Neither the County's brief, nor the record generally, contains an explanation from the County as to why the Extraordinary Measures were necessary.

Steel Service confirmed the Extraordinary Measures directive in a letter to Hunt dated October 8, 2001, and alerted Hunt that Steel Service would "be submitting a claim to you for any and all costs" related to the directive. In December of 2001, Steel Service sent a second letter to Hunt, this time containing Steel Service's "claim for equitable contract adjustment resulting from your

direction to accelerate [Steel Service's] work" on the project. The letter contained a "Claim for Additional Costs." Steel Service asserted in the letter that, "[p]er the terms of our Contract, particularly 4.7.7, 8.2 and 8.3, Steel Service is entitled to the compensation requested for the extraordinary measures required to implement the directed Recovery Schedule as discussed below and as referenced in Steel Service's Initial Notice of Intent to File Claim dated October 8, 2001, and Recovery Schedule letter dated October 12, 2001."

"Claims" are governed by paragraphs 4.7 and 4.8 of the Contract. Paragraph 4.7.1 defines a "Claim" as

> a demand or assertion by one of the parties seeking, [as] a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the [County] and [Steel Service] arising out of or relating to the Contract. Claims must be made by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim. [Steel Service] shall be entitled to make a Claim for an increase in the Contract Time and the Contract Sum for actual costs incurred by [Steel Service] for reasons other than the failure of [Steel Service] to perform its obligations under the Contract Documents.

Paragraph 4.7.7 of the Contract permits Steel Service to file written notice of a claim for an increase in the contract sum, and paragraph 4.8.5 requires the parties to submit claims to mediation before initiating litigation. Terms relating to time—including time limits, job progress, and Extraordinary Measures—are addressed in paragraph 8.2. Delays, acceleration, disruption, and extensions of time are governed by paragraph 8.3.

Just over a month after Steel Service alerted Hunt of its Claim, Steel Service, the County, and Hunt, along with the project manager, architect, and the Cincinnati Reds, executed the first of nine change orders. Change Order Number 1 (CO #1) sets forth the parties' agreement relating to Steel Service's initial claim for additional compensation in the amount of $3,292,000 for the Extraordinary Measures it had been directed to take by Hunt. CO #1 states that "[o]n December 18, 2001, pursuant to Articles 4.7.7, 8.2 & 8.3 of the Contract, [Steel Service] submitted a Recovery Claim Cost Document seeking the sum of approximately . . . $3,292,000.00 from the [County] . . . (the 'Claim')."

The parties acknowledge in CO #1 that Steel Service had already begun to implement the Extraordinary Measures and that Steel Service had incurred, and would continue to incur, costs associated with such measures. CO #1 also stated, however, that the County was in the process of reviewing and evaluating Steel Service's Claim "with respect to entitlement and quantum" and that "a determination has not yet been made as to the extent such Extraordinary Measures were made necessary by the fault, neglect, acts or failure to act of " Steel Service. The County nevertheless agreed to make a "Provisional Payment" to Steel Service in the amount of $700,000 for the limited purpose of partially funding the additional costs incurred by Steel Service arising from the Extraordinary Measures, subject to a final determination and resolution of the Claim.

Under CO #1, the parties further agreed that no liability was admitted with respect to the Claim—including, but not limited to, the responsibility for the costs associated with the Extraordinary Measures—and that the amount of the Provisional Payment would be deducted from the amount ultimately determined to be due to Steel Service, if any, regarding its Claim. If, however,

–5–

the Provisional Payment was later found to exceed the amount finally due to Steel Service, then Steel Service would be required to repay the County for that excess amount.

Change Orders (COs) are authorized and governed by Article 7 of the Contract, and are defined as "written instrument[s] prepared by the Construction Manager [Hunt] and signed by the [County], [Hunt], Project Manager, Architect and [Steel Service], stating their agreement upon all of the following:  a change in the Work; the amount of the adjustment of the Contract Sum, if any; and the extent of the adjustment in the Contract Time, if any."  (Paragraph 7.2.1)  "Work" means "the construction, services and supervision required by the Contract Documents."

A CO is the culmination of a process in which Hunt could request certain changes in the Work, and propose corresponding adjustments, if any, in the contract sum or the contract time, in the form of a written order called a Construction Change Directive (CCD).  (Paragraph 7.3)  Steel Service could then respond by either signing the CCD, thereby agreeing with the terms of the CCD, or advising Hunt or the architect of any disagreement that Steel Service had with the proposed changes or adjustments.  (Paragraphs 7.3.3 and 7.3.4)  According to Jim Simonson, the Executive Vice President of Steel Service who had overall responsibility for Steel Service's work on the project, CCDs were typically accompanied by revised drawings or sketches that required changes to the construction.

Simonson explained in his deposition that, upon receiving a CCD, Steel Service would submit to Hunt a Construction Change Proposal (CCP).  According to Simonson, a CCP is "a proposal for a change order to the contract."  The County, which agrees with Simonson's description of a CCP, noted that Steel Service submitted CCPs not only in response to CCDs from Hunt, but also

on its own initiative "whenever the company encountered a condition that it believed might affect its work." These CCPs, the County explained, "included a description of the alleged changed condition, as well as any proposed adjustment to the contract sum or contract time that Steel Service was seeking."

Hundreds of CCDs, CCPs, and Requests For Information (RFIs), along with thousands of sketches and drawings, were issued during the course of the project. Steel Service sometimes received several CCDs or other changes in a single day. Simonson explained that the company managed the flow of documents by utilizing the CCPs as a "document tracking system for document control." Each of these documents was assigned a number, so that all of the parties involved in the project could track the information and revisions. This system is reflected in COs #2-9, which list the items that are resolved by each CO. Every change item has both a unique CCD or RFI number and a unique CCP number. Steel Service's Claim, however, does not reference a CCD or a CCP, either in the December 2001 letter or in CO #1.

As CCDs and CCPs were exchanged, the parties would negotiate, settle, and resolve the changes by executing COs. Steel Service contends (and the County does not dispute) that the County drafted each CO, which was based on an AIA form. Throughout the course of the project, the parties executed a total of nine COs. CO #1 addressed Steel Service's Claim relating to the Extraordinary Measures taken, and COs #2-9 each settled anywhere from as few as one to as many as seventy-five CCDs and CCPs.

Steel Service asserts that it substantially completed the erection of the Ball Park's steel superstructure on or about May 6, 2002. Thereafter, the parties continued to execute COs to resolve

the outstanding CCDs and CCPs, and Steel Service submitted two amendments to its December 2001 Claim to include additional costs that arose from the Extraordinary Measures, for a total of $5,137,201.27. Among the additional costs were costs incurred by Ben-Hur Construction, LLC, Steel Service's erection subcontractor.

The parties eventually entered mediation to resolve their outstanding disputes, as required by the Contract. Dispute over the December 2001 Claim was one of the issues submitted to mediation. In August of 2003, during a break in the mediation proceedings, the parties executed CO #9. The parties thereafter continued their efforts at mediation, but were ultimately unsuccessful in reaching a resolution of their differences. Steel Service filed the present suit in March of 2004 against the County for breach of contract. Neither the record nor either party's brief contains any further details about the mediation proceedings.

The County filed a motion for summary judgment in March of 2006, asserting two grounds in support of its motion. Its first argument was that "the plain terms of Change Order No. 9 preclude Steel Service's claims" because CO #9 constitutes a "full, final and complete waiver and settlement with respect to any and all claims, demands and causes of action relating to changes affecting Steel Service on the Project." CO #9, in relevant part, reads as follows (with the sentences numbered for ease of reference throughout this opinion):

> [1] This Change Order #9 is a lump sum settlement and resolution with respect to all of the claims, demands and causes of action of [Steel Service] arising out of the Changes, with respect to [Steel Service's] overhead, profit, general conditions, fees, costs and expenses including, but not limited to, those fees, costs and expenses associated with the engineering, detailing, redetailing, fabrication, shop labor, freight, paint, raw materials, erection and equipment (the "Change Order"). [2] This Change Order Settlement constitutes a full, final and complete waiver and settlement with

> respect to any and all claims, demands and causes of action that [Steel Service] has arising out of or relating to the Changes. [3] Notwithstanding the foregoing, [the County] and [Steel Service] each hereby expressly reserve[s] any and all rights, claims, demands, defenses, or causes of action which either may have under the Contract with regard to claims not settled by the Change Order Settlement. [4] This Change Order #9 settles all TC-05A CCP's submitted by Steel Service Corporation with the exception of CCP Nos. 440, 526 & 527.

(TC-05A is the identifying number of the Contract.)

Below the foregoing paragraph is a list of 36 CCDs and RFIs, each listed with a corresponding CCP number. COs #1, 2, and 5 do not contain any of the above-quoted language. Each of COs #3, 4, 6, 7, 8, and 9 contain the first, second, and third sentences, but only CO #9 contained the fourth sentence. Quoting language from the second sentence of CO #9, the County argued that CO #9 "expressly extended to 'all of the claims, demands and causes of action' arising out of those changes," and that "settlement of all of the CCP's resolved all of Steel Service's claims." Steel Service, on the other hand, contended that the fourth sentence of CO #9 "settles only 'CCPs,' not the 'claims' expressly reserved in Change Order #9 as well as in Change Order #s 3, 4, 6, 7 and 8." (Emphasis in original.) The district court granted summary judgment to the County, concluding that

> [t]he unique language of Change Order #9, 'settles all TC-05A CCPs submitted by Steel Service Corporation with the exception of CCP Nos. 440, 528 & 627.' [quoting the fourth sentence of CO #9] . . . [T]he Court finds the language of Change Order #9 to be clear and unambiguous as to its intent to settle not only the particulars of Change Order #9, but also the cumulative effect of Change Orders 1-8 as described in 7.2.4 of the Contract Conditions, reserving only the three enumerated CCPs.

Rather cryptically and without explanation, the district court also noted that "Change Orders are intertwined with the deployment of Extraordinary Measures" and, later, that "the utilization of Extraordinary Measures is intertwined with CCPs."

In the County's second argument in support of its motion for summary judgment, the County contended that some of the damages claimed by Steel Services "are not damages that it has itself incurred, but are attributable to 'sponsored' claims of its subcontractors," and that the subcontractors "can have no claim against the County for breach of contract" because there was no privity between the County and the subcontractors. Both parties agreed that Ohio law has not endorsed an exception to the privity requirement for pass-through claims.

The Contract between the County and Steel Service sets forth a general contractor-subcontractor arrangement for the project, whereby Steel Service's subcontractors incur costs for their work on the project and bill those costs to Steel Service. (Paragraph 5.3.2.2) Steel Service is required, in turn, to bill the subcontractors' costs—along with the costs that Steel Service itself incurs—to the County in its monthly Application for Payment. (Paragraph 9.3) The County then pays Steel Service for both Steel Service's own costs and for the costs of Steel Service's subcontractors. (Paragraphs 9.3 and 9.6) Paragraph 9.6.2 provides that Steel Service "shall promptly pay each Subcontractor, upon receipt of payment from the [County] on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled." Steel Service acknowledges that there is no privity of contract between its subcontractors and the County.

The district court also "agree[d] with Defendant's argument that Ohio does not recognize sponsored claims and as Steel Service has no liability to [subcontractor] Ben-Hur it would have no

–10–

legal basis upon which to assert a claim against Defendant County on behalf of Ben-Hur."

Accordingly, the district court concluded that "Defendant's Motion for Summary Judgment as it

relates to sponsored subcontractor claims is granted." The court observed, however, that issues of

fact remained with regard to whether Steel Service is entitled to recover its own additional costs

incurred under the Contract. Steel Service timely filed this appeal, in which both parties assert the

same arguments that they raised before the district court.

## II. ANALYSIS

### A.     Standard of review

We review de novo the district court's grant of summary judgment. *Int'l Union v. Cummins,

Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must

construe the evidence and draw all reasonable inferences in favor of the nonmoving party.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue

is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 251-52 (1986).

### B.     Substantive law

The County is a local government entity incorporated in Ohio, and Steel Service is

incorporated and has its principal place of business in Mississippi. "In diversity cases such as this,

we apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). The Contract at issue calls for Ohio law to apply. (Paragraph 13.1.1)

Under Ohio law, "the construction of written contracts is a matter of law." *Hil-Roc Condo. Unit Owners Ass'n v. HWC Realty, Inc.*, 2006 Ohio App. LEXIS 4701 at *11 (Ohio Ct. App. Sept. 14, 2006). "The goal of construction of a contract is to find the intent of the parties." *Abrams v. Siegel*, 850 N.E.2d 99, 106 (Ohio Ct. App. 2006). Agreement of the parties "is to be ascertained from the language of the instrument itself, and there can be no implication inconsistent with the express terms thereof." *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 901 (Ohio 1999); *see also Abrams*, 850 N.E.2d at 106 ("The presumption is that the parties' intent may be ascertained in the language used in the written instrument.").

Furthermore, a contract "is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004). "[T]he entire document is to be given weight," and the "plain rule of construction requires that every provision of a contract shall be given effect if possible." *Abrams*, 850 N.E.2d at 106. And "except where the reformation of a written contract is sought in equity, evidence can not be introduced to show an agreement between the parties materially different from that expressed by clear and unambiguous language of the instrument." *Latina v. Woodpath Dev. Co.*, 567 N.E.2d 262, 264 (Ohio 1991).

C.    **The effect of CO #9**

The fourth sentence of CO #9 states that it "settles all TC-05A *CCP's* submitted by Steel Service Corporation with the exception of CCP Nos. 440, 526 & 527." (Emphasis added.) This language is clear and unambiguous. *See Schachner v. Blue Cross & Blue Shield*, 77 F.3d 889, 893 (6th Cir. 1996) ("Contract language is ambiguous if it is subject to two reasonable interpretations."). CO #9 unambiguously settled all of Steel Service's outstanding *CCPs*, but did not settle Steel Service's outstanding *claims*. In addition to the plain language of the sentence itself, this conclusion is supported by the parties' inclusion of the third sentence, whereby they "expressly reserve[d] any and all rights [and] *claims* . . . with regard to *claims* not settled by the Change Order Settlement." (Emphasis added.) Thus, at the same time that the parties settled all but three *CCPs*, they reserved their rights relating to outstanding claims not settled by CO #9. Both the County's position and the district court's conclusion—that CO #9 settled Steel Service's Claim—rely on the assumption that the Claim is a CCP and a reading of CO #9 that gives no effect to its third sentence. We respectfully disagree with both the assumption and the reading.

1.      A "claim" *versus a* "CCP"

In light of the unambiguous language quoted above, CO #9 could settle Steel Service's Claim only if the Claim were a CCP. But our review of the Contract and the record shows that the Claim is not a CCP in either form or substance. As a matter of form, Steel Service's first letter in response to Hunt's Extraordinary Measures directive, dated October 8, 2001, stated that Steel Service would be "submitting a claim" for costs related to the acceleration of its work. Consistent with that letter, Steel Service thereafter submitted a "Claim for Additional Costs" in December of 2001. The

December letter refers repeatedly to Steel Service's "Claim" and nowhere does it mention a CCD, a CCP, or the CCP process.

The County, moreover, by executing CO #1 in January of 2002, expressly acknowledged and accepted that Steel Service had submitted a "Recovery Cost Claim Document" for costs associated with the Extraordinary Measures acceleration. Both this document and Steel Service's prior correspondence repeatedly refer to the "Claim"; neither references a CCD or CCP, and neither invokes the CCP or CO process. Indeed, the second paragraph of CO #1 explicitly recognizes the fact that the Claim was submitted pursuant to Article 4 of the Contract, which governs "Claims and Disputes," and specifically cites paragraph 4.7.7, the provision that permits "Claims for Additional Costs."

Also telling is the fact that the Claim does not bear the identifying mark of a CCP—a CCP number. According to Simonson's testimony, which is supported by COs #2-9 and is undisputed by the County, each CCP was assigned a unique document number for tracking purposes. The Claim bears no such number or "CCP" designation, and there are no references to such a number or designation in the record that correspond to the Claim.

"Claims" and "CCPs," moreover, are distinguishable not only in form, but also in substance. As noted in Part I above, the Contract defines a "claim" as a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time, or other relief with respect to the terms of the Contract. A claim may also include other disputes and matters in question between the parties. (Paragraph 4.7.1)

Steel Service's Claim is clearly a "claim" under that definition. Hunt, on behalf of the County, directed Steel Service to undertake Extraordinary Measures to make up for lost time in the project construction schedule. Steel Service, in turn, undertook such measures and incurred additional costs in doing so—facts that the County accepted in CO #1 and does not now dispute. In its December 2001 letter, Steel Service notified the County that, under the terms of the Contract, it "is entitled to the compensation requested" for such additional costs. Steel Service, in other words, asserted a contractual right to payment for the extra costs incurred in performing the Extraordinary Measures requested. The description of Steel Service's Claim in CO #1, which was accepted by the County, is consistent with Steel Service's December 2001 letter. Such an assertion satisfies the contract definition of a "claim," which includes an "assertion by one of the parties seeking, a[s] a matter of right, . . . [the] payment of money." (Paragraph 4.7.1)

The way the parties defined and dealt with CCPs does not apply to Steel Service's Claim. Although the term "CCP" is not defined anywhere in the Contract and appears, undefined, only in COs #3-9, the parties agree on its meaning, which Jim Simonson of Steel Service explained in his deposition. A CCP, as noted in Part I above, is "a proposal for a change order to the contract" and is used to propose a change in the Work—either in response to a CCD or RFI from Hunt or upon Steel Service's identification of the need for a change in the Work—and corresponding adjustments to the contract sum or construction time schedule.

Steel Service's Claim, as set forth in its December 2001 letter, is not a "proposal for a change order to the Contract." It does not propose a change in the work. In fact, it is not a proposal for

anything at all. Rather, it is a demand for compensation that Steel Service believes it has a right to recover under the terms of the Contract.

Furthermore, even a cursory review of the CCPs submitted during the course of the project illustrates the substantive distinction between Steel Service's Claim and a CCP. CCP 271, for example, memorializes that "[m]embers MK4004 & MV4004 [are] revised to W14x48 and W14x61." Similarly, CCP 291 is described as "[d]esign revisions to suit SKS 639 changes to light tower to allow for light fixture clearance." CCP 387, just to give another example, calls for Steel Service to "[s]horten columns in Area 7 due to incorrect concrete elevations." The Claim, unlike the CCPs listed in the various COs, does not propose or describe specific changes in the construction of the Ball Park; it instead asserts a contractual right to compensation for the costs of the Extraordinary Measures.

But the County argues that "the claims Steel Service presented in the lawsuit below were first presented during the course of the Project through the contract change process," and that "the CCP process was the genesis of the claims Steel Service pursued in the lawsuit." In support of its argument, the County points to Simonson's deposition, in which he said that "what simply became a change proposal for the acceleration cost has now morphed into a claim which has now morphed into a lawsuit." The County's argument, however, is unavailing.

Nothing in the record, including Simonson's comments, suggests that Steel Service intended to submit a CCP instead of a "claim," or even that its Claim was first drafted as a CCP. To the contrary, Steel Service sent at least two letters to Hunt that consistently referred to a "claim" and invoked Article 4 of the Contract (captioned "Disputes and Claims"). This documentation was the

basis for CO #1 and was readily available to the County when it drafted and executed CO #1. Whatever the "genesis" of Steel Service's Claim, the language of CO #1 clearly shows that Steel Service actually submitted, and the County accepted, a "claim" and not a "CCP." Simonson's statement quoted above does not contradict the express agreement of the parties, which is to be ascertained from the language of the Contract itself (here, CO #1). *See Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 901 (Ohio 1999).

The County also had the benefit of the foregoing documentation when it drafted and executed CO #9 in August of 2003, one and a half years after CO #1 was signed. If the County had wanted or intended to settle Steel Service's Claim, it could have done so by simply drafting the fourth sentence to settle the CCPs *and* Steel Service's December 2001 Claim. Accordingly, the County's argument does not change the analysis set forth above, and does not support the conclusion that the Claim is actually a CCP settled by CO #9.

The County also argues that "the trial court was correct in concluding that the claims Steel Service alleged were 'intertwined with CCP's' and therefore released through Change Order No. 9." But its reliance on this ambiguous statement, which is unsupported by any analysis, is misplaced. In the first place, the County has misstated the district court's language. The court did not conclude that Steel Service's *claims* were intertwined with CCPs. It determined, rather, that "*Change Orders* are intertwined with the deployment of Extraordinary Measures" and that "the utilization of Extraordinary Measures is intertwined with *CCPs*." (Emphasis added.) But even the correct language does not help the County because the Contract provisions that authorize Extraordinary

Measures do not refer to COs or CCPs, nor do they set forth any procedures by which Steel Service should seek compensation for its costs.

In contrast, paragraph 4.7.1 suggests that Extraordinary Measures are connected to *claims*. Paragraph 4.7.1 provides that "[Steel Service] shall be entitled to make a Claim for an increase in the Contract Time and the Contract Sum for actual costs incurred by [Steel Service] for reasons other than the failure of [Steel Service] to perform under its obligations under the Contract Documents." Accordingly, compensation for costs relating to Extraordinary Measures was properly sought as a claim under Article 4 of the Contract.

### 2. *The third sentence of CO #9*

The third sentence of CO #9 expressly reserves Steel Service's rights with regard to its Claim. It states that both parties "expressly reserve any and all rights, *claims*, demands, defenses, or causes of action which either may have under the Contract with regard to *claims not settled by the Change Order Settlement*." (Emphasis added.) The County's argument that CO #9 settled Steel Service's Claim fails to give effect to this sentence, as Ohio law requires. *See Abrams v. Siegel*, 850 N.E.2d 99, 106 (Ohio Ct. App. 2006). The clear and plain language of sentence three reflects the parties' understanding that CO #9 did not settle all of the then-outstanding claims.

### 3. *The other sentences of CO #9*

CO #9's remaining sentences also fail to support the County's argument. As already discussed in Part II.A.1. above, the Claim is not a CCP and therefore was not settled under sentence four. This only leaves the possibility that it was settled by sentences one or two. Both sentences are similar in that they provide for a full and final waiver of claims with respect to any and all claims,

demands, and causes of action that Steel Service has arising out of "the Changes." The word "Changes" is not defined by the Contract, but in context seems to refer only to the changes listed in CO #9. We reach this conclusion because the identical language is found in COs #3, 4, 6, 7, and 8, and those COs clearly did not settle CO #1. Moreover, any inference that CO #9 was intended to settle Steel Service's Claim is undermined by the fact that the parties continued their efforts to mediate the Claim even after CO #9 was executed.

In sum, Steel Service's Claim arose out of Hunt's instruction to employ Extraordinary Measures, and did not arise out of any CCPs listed in CO #9. Steel Service's Claim was accordingly not settled by CO #9, and the district court erred in granting summary judgment for the County on that basis.

**D.    "Pass-through" subcontractor claims**

The district court also accepted the County's characterization of Steel Service's claim for subcontractor costs as a "pass-through" or "sponsored" claim (which the parties agree is not presently recognized under Ohio law) and held that Steel Service could not recover the subcontractor costs it seeks. The district court should not have reached this issue, however, because it concluded that the County was entitled to summary judgment on the ground that CO #9 fully settled Steel Service's Claim. Although we do not decide this issue here, we believe that the County's pass-through-claim argument requires further clarification because it will be properly before the district court on remand.

As discussed in Part I above, the Contract mandates the traditional general contractor-subcontractor arrangement that is utilized throughout the American construction industry.

*See* 1-3 Construction Law P. 3.01(1)(d) (Bender 2006). Under that arrangement, the subcontractors billed Steel Service for their costs, which Steel Service in turn passed along to the County together with Steel Service's own costs. Steel Service, in return, is entitled to compensation from the County for the reasonable costs of its subcontractors, including, in certain circumstances, the subcontractors' overhead and profit. (Paragraphs 7.3.6.2, 7.3.10) The County is then expressly obligated to pay for costs incurred by Steel Service's subcontractors by remitting payment to them via Steel Service. (Paragraph 9.3.6) This arrangement, although governed by the terms of the Contract between the County and Steel Service (in addition to the terms of the subcontract agreements), creates no contractual relationship between any of the subcontractors and the County. (Paragraph 1.1.2) Nevertheless, the County is contractually obligated to pay for certain subcontractor costs, and the Contract provides a mechanism for such payment.

In this case, Hunt directed Steel Service to take Extraordinary Measures in completing its work under the Contract, Steel Service's subcontractors were in turn required to do the same, and both Steel Service and its subcontractors incurred extra costs in undertaking such measures. The Contract appears to contemplate such a scenario and to permit—even require—Steel Service to present its costs, including those incurred by its subcontractors, to the County for compensation. To be sure, a portion of Steel Service's claimed costs are attributable to subcontractor costs, and Steel Service is "passing them along" to the County. But passing along such costs appears to be expressly permitted by the Contract. Indeed, the County's overbroad argument would seem to preclude Steel Service from ever submitting a claim for reimbursement of subcontractor costs. We therefore suggest that the district court ask the County to clarify the reasons why it believes that Steel

Service's claim for subcontractor costs is not permitted by the terms of the Contract that govern the subcontracting arrangement.

Furthermore, Steel Service's complaint asserts claims against the County in Steel Service's own right for breach of contract, and not on behalf of a subcontractor. We therefore also suggest that the district court ask the County to explain the basis on which it argues that Steel Service is asserting "pass-through" claims rather than seeking to reimburse itself for subcontractor costs incurred under the Contract.

Finally, we find puzzling the County's reliance on the fact that Steel Service may have settled all claims with its subcontractors, and the related argument that, because Steel Service has no outstanding liabilities to them, Steel Service may not recover subcontractor costs from the County. That fact, if anything, would seem to lend support to the conclusion that Steel Service is not asserting a cause of action on behalf of its subcontractors, but rather on its own behalf. That is, having been paid for their costs, the subcontractors would have no basis for claiming damages due to the County's alleged breach of contract.

On remand, the issue of what costs Steel Service may recover under the Contract will be properly before the district court. And whether Steel Service may recover subcontractor costs will require an inquiry into whether it is, in fact, asserting a pass-through claim on behalf of its subcontractors or simply seeking compensation in its own right as general contractor under the terms of the Contract.

**E.      Damages**

Because we are reversing the district court's judgment, we need not address the County's final argument that Steel Service's damages, if any, are limited to its "actual" costs allowed under Paragraph 8.3.3.6. That issue, which was not properly before the district court to decide in light of its determination that CO #9 fully settled Steel Service's Claim, can be appropriately addressed on remand.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court granting summary judgment to the County and **REMAND** the case for further proceedings consistent with this opinion.